UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 14-20560-CIV-MOORE/MCALILEY

-------------------------------------x
HAWAIIAN AIRLINES, INC.
                              Plaintiff,

- against –

AAR AIRCRAFT SERVICES, INC., f/k/a
AAR AIRCRAFT SERVICES - MIAMI,
INC., and MANKIEWICZ COATINGS,
LLC
                              Defendants.

-------------------------------------x

## MANKIEWICZ COATINGS, LLC'S MOTION FOR SUMMARY FINAL JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Mankiewicz Coatings, LLC ("Mankiewicz"), through counsel and pursuant to FED. R. CIV. P. 56 and Local Rules 7.1 and 56.1, hereby submits its Motion for Summary Final Judgment and Incorporated Memorandum of Law on all claims for relief asserted by Plaintiff, Hawaiian Airlines, Inc. ("HAL"), in its First Amended Complaint, and states as follows:

## I.       NATURE OF THE CASE

In this lawsuit, HAL seeks damages against Mankiewicz relating to fuselage corrosion sustained on eleven (11) of its Boeing 717 aircraft, which was allegedly caused by HAL's selection and specification of Mankiewicz's chromate free paint products for use in repainting the exterior of its 717 and 767 fleet during 2010-2011.

## II.      STATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY

1.       HAL is a commercial airline based in Honolulu, Hawaii.  (Sundquist Dep. 113:1-2).  On August 3, 2009, at HAL's invitation, certain representatives of Mankiewicz, including its

Managing Director, Peter Dietz, traveled to Honolulu, Hawaii, to make a presentation to HAL about Mankiewicz's history and experience in developing aircraft paint products, and its Basecoat and Clear Coat paint system, and to generally market its products for use on HAL's aircraft. (Dietz Dep. 44:5–53:5).[1] HAL became familiar with Mankiewicz's products from the European aircraft manufacturer ("Airbus") because HAL had recently ordered several new Airbus A330 aircraft that were painted with Mankiewicz's products. (Smith Dep. 27:20-28:1). HAL had met with Airbus in Toulouse, France in July of 2009, and was interested in using a uniform paint system for the rest of its aircraft. (Smith Dep. 57:10-23; 217:10-218:24).

2.    At the Honolulu presentation, Mankiewicz highlighted that its products were original equipment manufacturer ("OEM") approved by Airbus (which they were), but not OEM approved by Boeing. (Dietz Dep. 45:7–51:2; Lai Dep., Ex. 92).

3.    Later that same day, Christina Tredway, HAL's engineer who organized and attended the presentation, emailed Mankiewicz a draft of HAL's internal Engineering Specification Document ("ESD"), by which HAL specified and approved Mankiewicz's chromate-free primer, basecoat, clear coat paint system for use on HAL's remaining fleet, including, its Boeing B717-200 ("717") aircraft. (Lai Dep. Ex. 81).[2]

4.    HAL's engineers finalized and approved the ESD specifying Mankiewicz's chromate-free paint system as the "preferred method of paint" for its Boeing 717 and 767, and Airbus A330-200 aircraft in October 2009. (Smith Dep. Ex. 18). HAL's engineer (and

---

[1] The Mankiewicz's paint products at issue are exclusively marketed to commercial maintenance and repair organizations, commercial airlines, and related commercial entities. (Dietz Aff. ¶ 7 (a copy is attached hereto as **Exhibit "A"**); Lai Dep. 21:6-24). The paint products are not normally used for personal, family, or household purposes. (Dietz Aff. ¶ 7). At all times relevant hereto, Mankiewicz has exclusively sold its aviation paint products to commercial airlines or related commercial entities for application to commercial aircraft. (Id. at ¶ 8).

[2] The 717 aircraft is a commercial aircraft used by HAL for commercial purposes. (Sundquist Dep. 112:15-25).

corporate representative) testified that he does not rely on sales pitches and that he reviewed the test data supporting Mankiewicz's products as part of his approval of the ESD, and that the test results were correct to his knowledge.  (Smith Dep. 85:15- 86:13; 104:14-23, Ex. 19).

5.    HAL's ESD required compliance with Mankiewicz's Seevenax application Guide for the specified Seevenax H/S CF-Primer 113-44 (the "Application Guide"), in repainting the aircraft.  (Id.).  The Application Guide specified that for aluminum aircraft (such as the 717) a "chromate conversion coating (Alodine 1000, 1200, or 1200S)" must be applied according to manufacturer's instructions as a pretreatment to the aircraft before the primer is applied.[3]  (Lai Dep. Ex. 84).  Thus, the "paint system" or "stackup" (in industry parlance) approved by HAL for use on its 717s consisted of a _chromated_ pre-treatment (Alodine), followed by Mankiewicz's chromate-free ("CF") primer, basecoat and clear coat paint products (hereinafter referred to as the Mankiewicz "Paint System").

6.    Mankiewicz never represented to HAL that its Paint System was approved to DMS 2104, the applicable primer specification for 717 aircraft.  (Smith Dep. 210:24-211:6).[4] HAL knew this, and, at the time HAL drafted the ESD, HAL's engineers also reviewed the maintenance manuals and specifications for the aircraft, and knew that the Paint System was not Boeing OEM approved and not included in the qualified parts list ("QPL") of the maintenance manual. (Smith Dep. 197:22-25; 199:3-200:2l; 210:24-211:6; Woodward Dep. 154:25-155:16).

7.    In fact, HAL's internally-prepared ESD included a second option ("Option 2") for repainting the aircraft with Boeing OEM (DMS 2104) approved primer and paint products (which were chromated), but provided that Mankiewicz's Paint System ("Option 1") was preferred.  (Smith Dep. 142:6-144:7, Ex. 18).  To the extent HAL had any questions or concerns

---

[3] Alodine pretreatment is not manufactured by Mankiewicz.
[4] Daniel Smith was HAL's designated corporate representative for engineering issues.

regarding the Paint System, HAL's engineers could have easily contacted Boeing to inquire as to whether the Paint System met Boeing's specifications, was Boeing OEM approved, and would meet HAL's particular needs, but chose not to do so.  (Smith Dep. 201:10–202:9; Woodward Dep. 155:22-156:16).  In short, HAL specified the Paint System knowing that it was chromate-free and not Boeing OEM approved, and with full knowledge of and access to applicable specifications relating to its 717s to confirm the data provided by Mankiewicz was accurate.

8.      On November 17, 2009, HAL and AAR Aircraft Services, Inc. ("AAR"), an aircraft maintenance, repair, and overhaul company (referred to in the industry as an "MRO"), entered into an Aircraft Maintenance Services Agreement ("AMS Agreement"), whereby AAR agreed to perform a variety of maintenance and repair services on certain of HAL's 717s, including, but not limited to, the stripping and repainting of the exterior of eleven (11) of the aircraft.  (Sardinha Dep. 180:18–181:25, Ex. 10).

9.      In order for AAR to perform the repainting services, AAR submitted a series of Purchase Orders to Mankiewicz to purchase its paint products used in the Paint System.  (Dietz Aff. ¶3).  Mankiewicz responded by tendering a corresponding series of Order Confirmations, followed by delivery notes and invoices, setting forth the quantities, prices, and terms of the products purchased (the Purchase Orders, Order Confirmations, delivery notes, and invoices are referred to as the "AAR Agreements," a sample of which is attached to Peter Dietz's deposition as Exhibits 74 and 77).  (Dietz Aff. ¶3; P. Dietz. Dep., Exhs. 74 & 77).  Some of the Purchase Orders referenced HAL in the notes line, but none of the Purchase Orders expressed an intent to directly and primarily benefit HAL, and AAR never expressed such an intent to Mankiewicz in connection with its Purchase Orders.  (Dietz Dep. Exhs. 74 & 77).  Additionally, Mankiewicz's Order Confirmations, delivery notes, and invoices did not reference HAL or express any specific

4

intent to directly benefit HAL, and Mankiewicz never expressed such an intent to AAR or HAL. (Dietz Aff. ¶ 4; Dietz Dep. Exhs. 74 & 77).  Instead, Mankiewicz contracted with AAR, not HAL, as the intended and primary beneficiary of the sale of its paint products.  (Dietz Aff. ¶ 5).

10.    No express contract or privity ever existed between HAL and Mankiewicz relating to the purchase of the Paint System used by AAR for repainting eleven of HAL's 717s. (Dietz Aff. ¶ 6; Sardinha Dep. 180:9-182:18; Lai Dep. 104:2-24).

11.    Pursuant to the AMS Agreement between HAL and AAR, eleven of HAL's 717s were stripped by AAR, put through a maintenance cycle, and repainted with the Paint System on a one-by-one rolling basis during 2010 and 2011.  (Am. Compl. ¶ 17).

12.    In 2012 and 2013, HAL allegedly began discovering what it characterizes as accelerated corrosion on the fuselages of the 717s that had been repainted by AAR.  (Am. Compl. ¶ 19).[5]  Some of the batches of Mankiewicz's Paint System used on both HAL's 717's and 767's are the same, and HAL is not experiencing corrosion problems on the 767's or the A330's.  (Smith Dep. 73:20-75:8; 205:7-19).  The 767's, like the 717's, were older aircraft which were stripped and repainted, but the 767 work was performed by a different MRO, Delta Tech Ops, in Atlanta, Georgia.  (Smith Dep. 147:4-21; Dietz Dep. 60:20-61:5).  The record also shows that HAL's fleet of Boeing 717's had a history of corrosion problems with OEM paint, dating back to 2003 (just after the 717's first entered service).  (Sundquist Dep. 135:11-19).

---

[5] HAL states in its court filings that although it has experienced corrosion on both the wings and fuselages of the 717 aircraft, HAL's claims against AAR (who was dropped as a Defendant in the First Amended Complaint) related only to corrosion on the wings (allegedly caused by poor workmanship, application errors and other deficiencies in the work performed by AAR), whereas HAL's claims against Mankiewicz relate solely to corrosion on the fuselage of the affected 717 aircraft (allegedly caused by the use of a chromate-free primer).  (Buenconsejo Dep. 25:7-14); (ECF 1 ¶¶ 17-22) (Am. Compl ¶ 19).  No claim is made regarding the Paint System on the tail section of the 717s.

13.     In the spring of 2013, Boeing responded to HAL's reports of corrosion problems on the 717's.  (Woodward Dep. 33:9–34:11).  Specifically, Boeing reacted by conducting a visual inspection of certain of the 717s that were experiencing corrosion damage, and scraped three paint chip samples for testing from one section of one 717 (Tail No. N491),[6] which had been painted with Mankiewicz's Paint System by a different MRO, Leading Edge Aviation Services, Inc. ("Leading Edge"), pursuant to a separate contract.  (Woodward Dep. 33:9–34:11; Sundquist Dep. 96:18-97:8; 130:3-131:12).  Boeing tested the three paint chips only for the presence of chromate, and the test results confirmed that Mankiewicz's chromate-free primer, basecoat, and clear coat did not contain chromate.  (Woodward Dep. 33:9–34:11: 38:10-22; Sundquist Dep. 54:2–55:4; 100:5–102:8, Ex. HAL 11).  No further causal analysis or testing was performed, yet Boeing concluded that the use of a non-chromated primer that was not Boeing OEM approved to DMS 2104 was the "root cause" of the corrosion to the 717 fuselages. (Sundquist Dep. 58:6–59:21).

14.     Boeing supported its conclusion by stating that the "same paint system" had failed a 2008 Boeing corrosion test (the "2008 Boeing Test").   (Sundquist Dep. Ex. HAL 11). However, at deposition, Boeing's corporate representatives acknowledged that the 2008 Boeing Test was of *an entirely different coating system*, consisting of a Mankiewicz's chromate-free primer, basecoat and clearcoat over a chromate-free pretreatment known as AC131 Solgel or Boegel ("Solgel"), as opposed to Alodine.  (Kim Dep. 39:18-40:4; 91:13-17; 92:12-22; 93 21-94:17; 101:10-102:11).  Additionally, Boeing's corporate representative admitted that the 2008

---

[6] N491 is **not** one of the 717's at issue in this case.

6

Boeing Test tested the paint to BMS 10-72 standards, not the DMS 2104 standard applicable to the 717s.  (Kim Dep. 94:1-17; Sundquist Dep. Ex. HAL 11).[7]

15.     On June 30, 2014, HAL filed its First Amended Complaint ("Amended Complaint"), alleging claims against Mankiewicz for:  breach of contract (Count I), breach of third party beneficiary contract (Count II), breach of implied warranty of merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count IV), breach of warranty (Count V), breach of duty of good faith and fair dealing (Count VI), misrepresentation (Count VII), unjust enrichment (Count VIII), violation of the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA") (Count IX); and violation of the Magnuson Moss Warranty Act ("MMWA") (Count X).  (ECF. No. 27).

16.     Each of HAL's claims are based upon alleged misrepresentations made by Mankiewicz to HAL (cited numerous times throughout the Amended Complaint) that its Paint System was OEM approved, complied with all applicable specifications, including Federal Aviation Administration ("FAA") requirements, and would meet HAL's specific operational needs, including being suitable for the particular environmental conditions in which HAL's 717s routinely operate.  (Am Compl. ¶¶  9, 17, 20, 23, 28, 40, 45, 52, 55, 59, 62).  HAL also claims that Mankiewicz wrongfully withheld information from HAL that Mankiewicz failed the 2008 Boeing Test, and that in 2010, Mankiewicz gave "further assurances" of the suitability of its paint products for HAL's needs.  (Am. Compl. ¶¶  10, 17 ).

17.     On February 6, 2015, HAL filed a Motion to Amend the Expert Discovery and Mediation Schedule (the "Motion to Amend") (ECF No. 43).  In the Motion to Amend, HAL

---

[7] The lack of reliability and relevance of the 2008 Boeing Test and Boeing's April 2013 "conclusions" regarding the causation of the fuselage corrosion is addressed more fully in Mankiewicz's Motion to Exclude Evidence which is simultaneously filed.

SGR/12862007.5

acknowledged that it did not have evidence of the root cause of the corrosion damage experienced by the 717s at issue. (Id.). Specifically, HAL acknowledged that as a result of the testimony of Boeing's corporate representatives, HAL realized it would need to retain specialized experts to investigate and analyze the corrosion damage sustained by HAL's aircraft, and corroborate Boeing's test findings. (Id. at 5). Furthermore, HAL incorporates the affidavit of its recently retained expert witness who declared that it could take up to eleven (11) months to properly conduct and complete a corrosion investigation and testing program to determine the root cause of the corrosion. (Id.).[8]

18.     Pursuant to the Court's Order Scheduling Trial (ECF No. 23), discovery closed on March 9, 2015. Based on the foregoing facts, Mankiewicz submits that there is no genuine issue of material fact with respect to each of HAL's claims against Mankiewicz, and that Mankiewicz is entitled to summary final judgment as a matter of law.

### III.     MEMORANDUM OF LAW

### A.     Summary Judgment Standard

A motion for summary judgment must be granted if the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A party moving for summary judgment has the burden of showing that there is no genuine issue of material fact. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). Although courts should give credence to evidence favoring the non-movant, the non-moving party must provide more than a mere scintilla of evidence to survive the motion. *Reeves v.*

---

[8] On March 24, 2015, just three (3) days ago (and after the close of discovery), HAL served Mankiewicz for the first time with a purported "expert report" from Scott Marshall of McSwain Engineering. Accordingly, Mankiewicz has filed a Motion to Strike Expert simultaneously herewith.

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*).

In *Celotex*, the Supreme Court held the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 323-23. In this regard, the burden on the moving party to show the absence of a genuine issue of material fact may be discharged by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

**B.      HAL's Claims Fail Because HAL Has Failed To Timely Proffer Any Evidence Of Causation.**

In the instant case, Mankiewicz is entitled to summary judgment, as a matter of law, on each and every one of HAL's claims because HAL has failed to **timely** proffer any evidence that Mankiewicz's paint products **caused** the corrosion damage to the fuselage of the 717s repainted by AAR. It is not disputed that HAL's 717s are experiencing corrosion to varying degrees on some sections of the aircraft. However, in order for HAL to prove that Mankiewicz is liable for the damages caused by the fuselage corrosion, HAL has the burden to prove that Mankiewicz's Paint System was, in fact, the proximate cause of that corrosion. No reliable scientific, causal analysis has been conducted to date, and there is a universe of other potential causes of the corrosion (e.g., errors in application by AAR, failure to apply or improper application of Alodine or other products to the aircraft, or HAL's failure to properly rinse, wash, polish, or otherwise maintain the aircraft).

Despite filing suit on February 14, 2014, HAL has failed to proffer any reliable and compliant expert report to establish with reasonable Rule 702 certainly that Mankiewicz's Paint

9

System was the cause of the fuselage corrosion.  In fact, HAL has admitted that it does <u>not</u> have expert testimony as to the cause of the fuselage corrosion in its Motion to Amend Expert Discovery.  (ECF No. 43)  *See* Defendant's Motion to Strike Experts.  In that Motion, HAL admits that after deposing Boeing's witnesses in January of 2015, it only then retained an expert to conduct a complete corrosion investigation and testing program to determine the root cause of the corrosion on its aircraft, and that the testing could take up to eleven (11) months (before HAL's experts could even *begin* to formulate opinions), whereas the trial in this matter is set for June 15.  Thus, HAL's claims against Mankiewicz must fail, as a matter of law, because it admittedly has no scientific testing and data as to the root cause of the filliform fuselage corrosion for which Plaintiff seeks to hold Mankiewicz liable.  *See Celotex*, 477 U.S. at 323-23.

Moreover, to the extent HAL seeks to rely on the testimony and conclusions of Boeing's corporate representatives as to the cause of the corrosion to show that it has some evidence of causation, such testimony is wholly unavailing.  As set forth in more detail in Mankiewicz's *Daubert* Motion filed contemporaneously herewith, Boeing's testimony and "conclusions" regarding the cause of the fuselage corrosion are inapplicable to the 717s at issue, and are irrelevant, conclusory, and otherwise lacking in credibility or scientific reliability required by Fed.R.Evid. 702.  First, the three paint chips from one aircraft (N491) that was scraped and tested by Boeing was painted by Leading Edge, not AAR, and not sued upon.  The three 717s painted by Leading Edge (including N491) are not at issue in this case, and differences in application and environment, as well as other factors, make any such test results inapplicable to the cause of the fuselage corrosion to the eleven 717s at issue.  The conclusion reached by Boeing in 2013 as to the cause of the corrosion, or any opinions or conclusions based upon them, are not Rule 702 compliant and simply inapplicable to the present case.  *USA v. Batchelor*

*Robjohns*, Case No. 03-20164-CIV-UNGARO-BENAGES, 2005 WL 1761429 (S.D. Fla. June 3, 2005)(other experts that rely on that information will also be excluded *citing* Daubert).

Second, Boeing only tested for the presence of chromate in the paint chips and did perform any other tests, much less a scientific causal analysis of the corrosion.  It is undisputed that Mankiewicz's primer and paint are chromate free, and advertised it as such.  Boeing's test results confirm what all the parties already knew – that Mankiewicz's paint products were chromate free.  While Mankiewicz's products are not Boeing OEM approved to DMS or BMS specifications (which HAL knew when it drafted its ESD selecting the Paint System), this is not evidence of causation, nor does it create a genuine issue of material fact.

Third, HAL's "conclusion" that the use of Mankiewicz's chromate-free primer caused the fuselage corrosion because the primer failed the 2008 Boeing Solgel Test is entirely unscientific and conclusory.  The 2008 Boeing Test tested Mankiewicz's paint products on top of Solgel, a *chromate-free* pretreatment that violated the Seevenax Application Guide.  The Application Guide and HAL's ESD specified Alodine, a chromated pretreatment, on HAL's 717s.  Thus, as acknowledged by Boeing's representatives, the 2008 Boeing Test applied to an entirely different coating system.   (Kim Dep. 39:18-40:4; 91:13-17; 92:12-22; 93:21-94:17; 101:10-102:11).  Moreover, the 2008 Boeing Test was not done to the applicable DMS 2104 standard for the 717s, and Plaintiff cannot point to any record evidence that the Paint System fails DMS 2104.  The 2008 Boeing Test results are inapplicable to the determination of the cause of the fuselage corrosion.  HAL has failed to come forward with any competent evidence to prove that Mankiewicz's Paint System was the cause of the fuselage corrosion on the eleven 717s at issue.  Accordingly, Mankiewicz is entitled to summary judgment on HAL's claims as a matter of law.

C.     **HAL Lacks Privity and Standing to Bring the Claims Asserted in Counts I-VI.**

HAL lacks privity and standing, and is otherwise precluded as a matter of law from pursuing Counts I through VI of the Amended Complaint because an express contract does not exist between HAL and Mankiewicz, and furthermore because HAL was not an intended third party beneficiary of the AAR Agreements.  As such, HAL's claims fail as a matter of law.

1.     **There is no Express Contract between HAL and Mankiewicz.**

It is axiomatic that a claim for breach of an express contract under Florida law requires a party to prove:  (1) the existence of a contract between the parties; (2) breach; and (3) damages. It is similarly well-established under Florida law that warranty based claims, including breach of express warranty, require privity of contract between the parties.  *See Kaiser v. Depuy Spine, Inc.*, 944 F.Supp.2d 1187, 1193 (M.D. Fla. 2013).  Additionally, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained absent an allegation that an express term of the contract has been breached.  *See Ins. Concepts and Design v. Healthplan Servs., Inc.*, 785 So.2d 1232, 1234-35 (Fla. 4th DCA 2001).  Accordingly, if a contract does not exist, a claim for breach of the implied covenant of good faith and fair dealing does not lie.

Although the allegations are vague, Counts I, V, and VI of the Amended Complaint allege claims for relief based on breach of contract, breach of express warranty, and breach of the implied covenant of good faith and fair dealing, respectively.  However, the undisputed evidence in this case demonstrates that no express contract or warranty existed between HAL and Mankiewicz.  Instead, HAL and AAR were in privity of contract by virtue of the AMS Agreement, and Mankiewicz and AAR were in privity of contract pursuant to the AAR Agreements.  This undisputed fact is fatal to HAL's claims for breach of contract, breach of

SGR/12862007.5

warranty, and breach of good faith and fair dealing against Mankiewicz. Accordingly, Mankiewicz is entitled to summary judgment on these claims as a matter of law.

To the extent HAL asserts that its claims in Count I, V, and VI are based on its status as a third-party beneficiary of the AAR Agreements, these claims still fail as a matter of law. First, as discussed in more detail below, HAL is not an intended third party beneficiary of the AAR Agreements with standing to assert these claims. Also, HAL has already asserted a claim for breach of third party beneficiary contract based on the AAR Agreements between Mankiewicz and AAR in Count II. As such, to the extent HAL asserts that Count I is based on the same exact claim and theory, Counts I and II are redundant, rendering Count I superfluous. There is no genuine issue of material fact with respect to Counts I, V, and VI, and Mankiewicz is entitled to judgment thereon as a matter of law.

### 2.   HAL was not an Intended Third-Party Beneficiary of the AAR Agreements.

#### i.   Legal Standard

As set forth above, a plaintiff generally cannot recover economic losses for breach of contract or breach of an implied warranty in the absence of privity. *See, e.g., David v. Am. Suzuki Motor Corp.*, 29 F.Supp.2d 1309, 1323 (S.D. Fla. 2009); *Mesa v. BMW of N. Am.*, 904 So.2d 450, 458 (Fla. 3d DCA 2005). However, courts have found an exception to this rule and held that a plaintiff may pursue a claim of breach of contract and breach of implied warranties if the party is an **intended** third-party beneficiary of the contract. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981-82 (11th Cir. 2005) (emphasis added); *see also*, *Sanchez-Knutson v. Ford Motor Co.*, 2014 WL 5139306, at *10 (S.D. Fla. Oct. 7, 2014) (holding that the plaintiff could pursue a claim for breach of implied warranty through third-party beneficiary law).

The question of whether a non-party to a contract has a right to maintain an action on a contract as a third-party beneficiary is a matter of state law.[9]  *Rebman v. Follett Higher Educ. Group, Inc.*, 575 F.Supp.2d 1272, 1276 (M.D. Fla. 2008) (*quoting Bochese* 405 F.3d at 981. Under Florida law, a party is an intended third party beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong.  *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So.2d 1028, 1031 (Fla. 4th DCA 1994).  "If the parties had no such purpose in mind, any benefit from the contract reaped by the third party is merely 'incidental,' and any third party has no legally enforceable right in the subject matter of the contract."  *Bochese*, 405 F.3d at 982 (*citing Thompson v. Comm. Union Ins. Co. of N.Y.*, 250 So.2d 259, 262 (Fla. 1971)).

The contracting parties' intent to benefit the third party must be specific and must be clearly expressed in order to endow the third party beneficiary with a legally enforceable right.  *Id.* at 982 (*citing Am. Sur. Co. of N.Y. v. Smith*, 130 So. 440 (1930).  Additionally, it must be

---

[9] In the instant case, the issue of which state's law applies to the AAR Agreements depends upon an in-depth "battle of the forms" analysis under U.C.C. § 2-207, as AAR's purchase order terms and conditions state that Illinois law applies and Mankiewicz's order confirmations state that Missouri law applies.  Furthermore, if the Court finds that the contractual choice of law provisions conflict, and therefore do not become part of the agreement pursuant to U.C.C. § 2-207, then, applying Florida choice of law, the contract may be governed by South Carolina or Florida law.  However, for purposes of analyzing this issue, the appropriate governing law is irrelevant, as the third-party beneficiary standard is uniform among each of the states. *See, e.g., Peters v. Emp'r Mut. Casualty Co*, 853 S.W. 2d 300, 301 (Mo. 1993) ("a third-party beneficiary can sue to enforce the contract *if* the contract terms 'clearly express' an intent to benefit either that party or an identifiable class of which the party is a member."); *The People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, 400 N.E. 2d 918, 919 (Ill. 1980) (the test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract.); *Helms Realty, Inc. v. Gibson-Wall Co.*, 611 S.E. 2d 485, 488 (S.C. 2005) ("A third party beneficiary is a party that the contracting parties intend to directly benefit.").  Accordingly, this Motion analyzes the third-party beneficiary issue under Florida law, although the analysis and conclusion would be the same under Illinois, Missouri, or South Carolina law.

SGR/12862007.5

established that both of the parties to the contract actually and expressly intended to benefit the third party; "it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party." *Rebman*, 575 F.Supp.2d at 1277 (*citing Biscayne Inv. Group, Ltd. v. Guar. Mgmt. Servs., Inc.*, 903 So.2d 251, 254 (Fla. 3d DCA 2005).

Notably, the contracting parties' knowledge that the contract will ultimately benefit, or that the work performed or services rendered will ultimately accrue to, an identifiable third-party or class of third parties is insufficient to transform a third party that benefits from the contract into an "intended" third party beneficiary. *See, e.g., Publix Super Markets, Inc. v. Cheesbro Roofing, Inc.* 502 So.2d 484, 488 (Fla. 5th DCA 1987) (holding that a property owner was an incidental, as opposed to intended, third party beneficiary of a contract between a general contractor and subcontractor because even though the work performed ultimately accrued to the property owner, neither the contract nor anything else in the record indicated that the contract was intended to benefit anyone other than the parties); *see also Bochese*, 405 F.3d at 982-84.

### ii.    Application to HAL's Claims

In the instant case, the record clearly demonstrates that HAL is not an intended third-party beneficiary of the AAR Agreements, as a matter of law.  First, the AAR Agreements do not express any intent by Mankiewicz and AAR to directly and primarily benefit HAL.  In fact, Mankiewicz's Order Confirmations, delivery notes, and invoices do not contain a single reference to HAL, and AAR's Purchase Orders, at most, contain an incidental reference to HAL in the "PO Notes" line.  This incidental reference does not constitute an expression of intent.  Thus, the AAR Agreements do not clearly express a specific intent to directly benefit HAL.

The record also demonstrates that neither Mankiewicz nor AAR expressed an intent that the AAR Agreements directly and primarily benefit anyone other than themselves.  In fact, the

15

only evidence relating to Mankiewicz's intent is the affidavit testimony of Peter Dietz, its Managing Director, which provides that Mankiewicz understood and intended the direct and primary beneficiaries of the AAR Agreements to be AAR and Mankiewicz. Mankiewicz directly benefited from selling its products to AAR, and AAR benefited from obtaining the paint products required for it to perform the AMS Agreement.

HAL, on the other hand, was an incidental beneficiary at most, in that it benefited from AAR being able to perform the separate AMS Agreement for the repainting of its aircraft. Importantly, the fact that Mankiewicz knew that the paint products sold to AAR would ultimately be used by AAR to repaint HAL's aircraft is insufficient to transform HAL from an incidental beneficiary to an intended beneficiary. *See Cheesbro Roofing, Inc.* 502 So.2d at 488. Moreover, even if AAR intended to directly benefit HAL through the AAR Agreements, the unilateral intent of a party to a contract is insufficient to create an intended third-party beneficiary relationship. *See Rebman*, 575 F.Supp.2d at 1277. Therefore, HAL is not an intended third-party beneficiary of the AAR Agreements.

Because HAL is not in privity of contract with Mankiewicz (as discussed above), and is not an intended third-party beneficiary of the AAR Agreements, HAL lacks standing to sue Mankiewicz for breach of third party beneficiary contract, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.[10] Therefore, Mankiewicz is entitled to judgment on these claims as a matter of law.

---

[10] Additionally, to the extent HAL contends Counts I, V, and VI are based on a third party beneficiary theory (rather than a theory of ordinary contractual privity), such claims also fail for the same reasons as set forth above.

SGR/12862007.5

**D.**     **HAL's Claim for Violation of the Magnuson-Moss Warranty Act Fails.**

Section 2310(d)(1) of the Magnuson-Moss Warranty Act ("MMWA") provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Magnuson-Moss Warranty Act], or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). A "consumer" is defined under the MMWA as "a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty . . . applicable to the product, and any other person who is entitled by the terms of such warranty . . . or under applicable State law to enforce against the warrantor . . . the obligations of the warranty. . . ." 15 U.S.C. § 2301(3). Accordingly, for the MMWA to apply to a transaction, a "consumer" must have purchased a "consumer product."

Pursuant to the MMWA, a "consumer product" means "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ." 15 U.S.C. § 2301(1); *see also Kemp v. Pfizer, Inc.*, 835 F. Supp. 1015, 1024 (E.D. Mich. 1993) (granting summary judgment to defendant because a prosthetic heart valve is not a consumer product, the general public has no access to such devices and such devices, are not sold to unsuspecting consumers relying on the warranties of unscrupulous retailers).

Under this definition, Federal courts have held that specialized paint and coating products marketed and sold for commercial applications are not "consumer products" for purposes of the MMWA. *See, e.g., In re Ford Motor Co. Vehicle Paint Litigation*, Case No. MDL 1063, 1996 WL 426548, at *35 (E.D. La., July 30, 1996) (holding that paint purchased by Ford for commercial application at its manufacturing facilities was not a consumer product and could not

17

form the basis for a claim under the MMWA); *see also Gentek Building Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320 (6th Cir. 2007) (affirming summary judgment granted to defendant on MMWA claims and holding that Federal court removal was proper based on MMWA even though product was not a "consumer product" as defined in the MMWA).

HAL cannot state a claim for relief under the MMWA because Mankiewicz's paint products that were applied by the MRO facility to HAL's 717s are not "consumer products". HAL is not a "consumer," under the MMWA. The undisputed facts demonstrate that Mankiewicz's Paint System is primarily manufactured for and marketed to commercial MROs and commercial airlines, and there is no record evidence it is normally used for personal, family, or household purposes. In fact, Mankiewicz has exclusively sold its aviation paint products for use on commercial aircraft since at least 2009. Because Mankiewicz's paint products are not "consumer products" and HAL is not a "consumer" under the MMWA, summary judgment should be granted on the MMWA claim as a matter of law.

**E.     HAL Cannot Establish Justifiable Reliance on any Alleged Misrepresentations.**

The elements of a claim for misrepresentation are:  (1) a misrepresentation of material fact; (2) the representer knew or should have known of the misrepresentation made; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. *Fla. Women's Med. Clinic, Inc. v. Sultan*, 656 So.2d 931, 933 (Fla. 4th DCA 1995); *see also Jaffe v. Bank of Am.*, 67 F.Supp.2d 1299, 1319 (S.D. Fla. 2009).  With respect to justifiable reliance, this Court has held that:

> [E]very person must use reasonable diligence for his own protection.  Under any standard of conduct, and in the absence of accompanying actual deception, artifice, or misconduct, it is well agreed that **where the means of knowledge are at hand and are equally available to both parties**, and the subject matter is equally open to their inspection, if one of them does not avail himself of those

> means and opportunities, he will not be heard to say that he was deceived by the
> other's misrepresentations.

*Jaffe*, 67 F.Supp.2d at 1320 (emphasis added), (*citing Potakar v. Hurtak*, 82 So.2d 502, 504

(Fla.1955)); *see also*, *Crigler v. Cessna Aircraft Co*, 830 F.2d 169, 172 (11th Cir. 1987)

(affirming summary judgment on a claim for misrepresentation because the plaintiff had been

put on legal notice of problems with aircraft engine that were the basis of the misrepresentation

claim through an FAA airworthiness directive).

In the instant case, HAL's misrepresentation-based claims in Counts VII, VIII, and IX of

the Amended Complaint fail because even viewing the evidence in a light most favorable to

HAL, it cannot demonstrate that it acted in justifiable reliance on any of the alleged

misrepresentations, as a matter of law.   Specifically, HAL asserts that Mankiewicz

misrepresented that the Paint System was "OEM approved" and complied with all applicable

specifications, continued the misrepresentation through "further assurances", and failed to inform

HAL that it failed the 2008 Boeing Test.

Even assuming, *arguendo*, any misrepresentations were made (which is denied), HAL's

reliance was not justifiable, as a matter of law.   First, and notwithstanding the allegations in

HAL's pleadings, HAL admitted in deposition that it knew Mankiewicz's Paint System was not

OEM approved by Boeing and was not approved to DMS 2104 specifications, and in fact, has

acknowledged that Mankiewicz never made such a representation.   (Smith Dep. 210:24-211:6).

Second, HAL possessed all applicable specifications and maintenance manuals for its 717s, and

even included a second paint system option in its ESD that specifies an OEM-approved paint

system with OEM product numbers (and DMS 2104 approved primer).   Third, it is undisputed

that HAL frequently communicates with Boeing (frequent visits), and could have easily called

Boeing to determine whether Mankiewicz's Paint System met any applicable specifications and

would be suitable for its particular needs, but HAL never made any such inquiry.  Finally, HAL could not have justifiably relied on any alleged "further assurances" given by Mankiewicz in 2010 because HAL had already specified the use of the Paint System well before such statements were made, and HAL always knew Mankiewicz's products were not Boeing OEM-approved (or DMS approved).  In short, HAL had knowledge that the Paint System was not Boeing approved to DMS 2104 specifications, and the means of knowledge regarding the fitness of the product for HAL's needs were of equal (or greater) availability to HAL.  As a matter of law, HAL cannot establish justifiable or reasonable reliance on any alleged misrepresentations.

Additionally, as discussed in more detail in Section III. B, above, facts regarding Mankiewicz's alleged nondisclosure of the "2008 Boeing Test" are completely irrelevant because, Boeing tested Mankiewicz's products over a chromate-free pretreatment (Solgel), and Plaintiff has no data that the paint system failed the applicable DMS 2104 specification for 717s.  Thus, as a matter of law, Mankiewicz did not make a "misrepresentation" by not disclosing to Mankiewicz the results of the 2008 Boeing Test.

Therefore, HAL knew that Mankiewicz's paint system did not meet Boeing OEM specifications and had access to all Boeing and the relevant manuals to determine the products approved for use on the 717s.  While HAL specified a DMS 2104 approved product in its ESD, HAL's preferred option was Mankiewicz's Paint System with full knowledge of the relevant facts.  There were no misrepresentations by Mankiewicz, nor justifiable reliance by HAL.

**<u>CONCLUSION</u>**

For the foregoing reasons and authorities, Defendant, Mankiewicz Coatings, LLC, respectfully requests the Court to enter summary judgment on all ten claims asserted.

SGR/12862007.5

**SMITH, GAMBRELL & RUSSELL, LLP**

By: *s/ James H. Cummings*

Dana G. Bradford II
Florida Bar No.: 167542
dbradford@sgrlaw.com
apelegrin@sgrlaw.com
dmsmith@sgrlaw.com
James W. Middleton
Florida Bar No. 508152
jmiddleton@sgrlaw.com
tgreene@sgrlaw.com
James H. Cummings
Florida Bar No.: 27657
jcummings@sgrlaw.com
apelegrin@sgrlaw.com
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Telephone:  (904) 598-6127
Facsimile:  (904) 598-6227

Attorneys for Defendant
Mankiewicz Coatings, LLC

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2015, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert C. Owens, Esq.
ROBERT C. OWENS, P.A.
18890 SW 264th Street
Miami (Homestead), Florida 33031
Telephone: 305-245-6813
Facsimile: 305-245-6403
Email: bobowens@avlaw.com
Attorney for Plaintiff
Hawaiian Airlines Limited

Christopher R. Christensen, Esq.
Email: cchristensen@condonlaw.com
Anthony U. Battista, Esq.
Email: abattista@condonlaw.com
Condon & Forsyth LLP
7 Times Square
New York, New York 10036
Telephone: 212-490-9100
Facsimile: 212-370-4453

_____*s/ James H. Cummings*_____
Attorney

SGR/12862007.5