UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 14-20560-CIV-MOORE/MCALILEY

-------------------------------------x

HAWAIIAN AIRLINES, INC.
                                    Plaintiff,

- against –

AAR AIRCRAFT SERVICES, INC., f/k/a
AAR AIRCRAFT SERVICES - MIAMI,
INC., and MANKIEWICZ COATINGS,
LLC
                                    Defendants.

-------------------------------------x

**MANKIEWICZ COATINGS, LLC'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

## INTRODUCTION

In this lawsuit, Hawaiian Airlines, Inc. ("HAL") seeks damages against Mankiewicz Coatings, LLC ("Mankiewicz"), relating to alleged accelerated filiform corrosion sustained on the fuselages of eleven (11) of its Boeing 717 aircraft.  HAL's central theory is that Mankiewicz allegedly made misrepresentations to it regarding the suitability of Mankiewicz's paint products for use on HAL's 717s, which HAL allegedly relied on when it selected Mankiewicz's chromate-free ("CF") primer and paint products for use in repainting its aircraft.  HAL has included claims against Mankiewicz in its Amended Complaint (DE 27) for misrepresentation and violation of the Florida Deceptive and Unfair Trade Practices Act based on these allegations.  These claims, and the facts pertaining to them, are certainly disputed by Mankiewicz, but are not the subject of HAL's Motion for Partial Summary Judgment ("Motion") (DE 171).  Instead, HAL's Motion is for partial summary judgment as to liability on several <u>contractual</u> and <u>warranty-based</u> claims that HAL has asserted against Mankiewicz, which HAL "boot-straps" into its Amended Complaint on an attenuated third-party beneficiary theory.[1]

## SUMMARY OF ARGUMENT

HAL's Motion should be denied because, as a threshold issue, HAL's sole contractual and warranty-based remedies for any corrosion issues are limited to the bargained-for remedies, waivers and limitations provided in the comprehensive contract it *directly* entered into with a maintenance, repair and overhaul ("MRO") provider, AAR Aircraft Services, Inc. f/k/a AAR Aircraft Services – Miami, Inc. ("AAR").  HAL contracted with AAR for a broad range of maintenance and other work on HAL's aircraft, including stripping and repainting the exteriors of HAL's 717s.  HAL's claims are barred *ab initio* by such provisions.

Furthermore, should the Court reach the merits of HAL's Motion, the record reflects that HAL was not an *intended* third-party beneficiary of Mankiewicz's sale of its primer and paint products to AAR, or any other purchase of parts or materials that AAR made in order to perform under its agreement with HAL.  Instead, the work performed by AAR under this agreement was comprehensive and "turnkey," in that AAR agreed to purchase the necessary parts and materials

---

[1] HAL does not identify the specific warranty based counts in its Amended Complaint on which it is moving for summary judgment, and it is unclear if HAL is including its Magnuson-Moss Warranty Act ("MMWA") claim in this Motion, as HAL does not reference any specific facts or law pertaining to a MMWA claim.  Nevertheless, Mankiewicz will briefly address HAL's MMWA claim in this response.

(from numerous suppliers), perform the specified services, and return the aircraft to HAL as a completed unit for an agreed-upon price.  As such, AAR and Mankiewicz were the primary beneficiaries of the sale of Mankiewicz's paint products, not HAL.

Finally, even if HAL could circumvent its agreement with AAR and prove it is an intended third-party beneficiary (which it cannot do), HAL's Motion should be denied because no express warranty or implied warranty of fitness for a particular purpose existed between Mankiewicz and AAR.  Also, HAL submits no evidence that Mankiewicz's paint system is not "merchantable," and it is without question a matter in dispute (and a critical issue in this case) whether Mankiewicz's paint products proximately caused accelerated corrosion on HAL's 717s.

## FACTUAL BACKGROUND

In 2008, HAL purchased several Airbus A330 aircraft to add to its fleet.[2] (MC Opp. R. 56.1 ¶55).  Through this purchase, HAL learned that its Airbus A330's were painted with Mankiewicz's CF primer and paint, and that the paint system was lighter, dried quicker, had superior color retention, and was safer for the environment than chromate-based paint systems.[3] (MC Opp. R. 56.1 ¶55).[4]  Based on this information, HAL approached Mankiewicz about using Mankiewicz's CF paint products to repaint its Boeing 717 and 767 aircraft.  (DE 172, ¶26).

On August 3, 2009, at HAL's invitation, representatives from Mankiewicz traveled to Honolulu, Hawaii to discuss Mankiewicz's paint products with HAL.  (DE 172, ¶27).  During the meeting, Mankiewicz presented its CF paint system as Airbus original equipment manufacturer ("OEM") approved, and highlighted its superior color retention quality, among other things.  (MC Opp. R. 56.1 ¶56).  Later that same day, Christina Tredway, HAL's engineer who organized and attended the presentation, emailed Mankiewicz a draft HAL Engineering Specification Document ("ESD"), in which HAL specified and approved Mankiewicz's CF primer, basecoat, and clearcoat paint system for use on HAL's 717s.  (MC Opp. R. 56.1 ¶30).

---

[2] HAL is a commercial airline based in Honolulu, Hawaii.  (DE 27, ¶2).

[3] The Mankiewicz's paint system at issue is exclusively marketed to commercial maintenance and repair organizations, commercial airlines, and related commercial entities.  (MC Opp. R. 56.1 Stmt. ¶54).  The paint products are not normally used for personal, family, or household purposes.  (*Id.*).  At all times relevant hereto, Mankiewicz has exclusively sold its aviation paint products to commercial airlines or related commercial entities for application to commercial aircraft.  (*Id.*).

[4] Citations to HAL's Rule 56.1 Statement will be cited by its Docket Entry Number (DE 172).  Mankiewicz's Rule 56.1 Statement submitted in opposition to HAL's Motion will be cited as "MC Opp. R. 56.1 ¶ _".

HAL finalized and approved the ESD specifying Mankiewicz's CF paint system as the "preferred method of paint" for its Boeing 717 and 767, and Airbus A330-200 aircraft in October 2009. (MC Opp. R. 56.1 ¶34).

At all times relevant, HAL's engineers had access to and were familiar with the Boeing 717 maintenance manuals, and HAL **admittedly knew** that Mankiewicz's CF paint system was chromate-free, not Boeing OEM approved, and not included in the Qualified Parts List ("QPL") of the 717 maintenance manual. (MC. Opp. R. 56.1 ¶57). In fact, HAL's ESD included an "option 2" for repainting the 717s with Boeing OEM (DMS 2104) approved primer and paint products (which were chromated), but provided that Mankiewicz's CF paint system ("option 1") was preferred. (MC Opp. R. 56.1 ¶34).

On November 17, 2009, HAL contracted with AAR to perform a broad array of maintenance and repair services on HAL's 717s, including, but not limited to, the stripping and repainting of the exterior of 11 of the aircraft (the "Agreement"). (MC Opp. R. 56.1 ¶37).[5] The Agreement identifies 439 separate "task cards" for AAR to complete, including one task entitled "717 Hawaiian Airlines' External Aircraft Painting," which references HAL's Engineering Order ("EO") 11-08-06-12 and describes the task as "**Strip and Paint Exterior and Application of HAL Exterior Livery**." (*Id.*). Thus, AAR's repainting of HAL's 717s with Mankiewicz's paint system was one element of the work involved to complete 1 of 439 tasks. (*Id.*).

EO 11-08-06-12, was prepared and approved by HAL, and referenced HAL's ESD specifying Mankiewicz's CF paint system for repainting the 717s. (MC Opp. R. 56.1 ¶58). *HAL* also specifically instructed AAR to purchase and apply Mankiewicz's CF primer and paint system on its 717s, including the specific paint colors to purchase, but did not discuss with AAR why it wanted to use the paint products. (*Id.*).[6] AAR admittedly did not communicate with Mankiewicz regarding the selection of the paint system. (*Id.*).

Section 6 of the Agreement contains a six (6) month limited warranty in favor of HAL relating to the services performed by AAR, including parts and materials AAR used to perform the required work. (MC Opp. R. 56.1 ¶37). Specifically, Section 6.1 of the Agreement provides:

---

[5] HAL initially sued AAR and Mankiewicz in this lawsuit, but settled its claim with AAR and dropped it as a party. (DE 1, 18).
[6] The specific paint system, or "stack-up" for repainting HAL's 717s included a chromated pre-treatment known as Alodine, which is not manufactured by Mankiewicz, followed by application of Mankiewicz's CF primer, basecoat, and clearcoat. (MC Opp. R. 56.1 ¶66).

> AAR warrants that the services performed by AAR hereunder will be free from
> defects in workmanship and that it shall have good title to all goods, parts, and
> components sold or exchanged by AAR for the Services pursuant to this
> Agreement, free and clear of any and all claims, liens, mortgages or other
> encumbrances of any kind.

(MC Opp. R. 56.1 ¶37).[7]  Section 6.7 conspicuously (in bold and larger print) provides that this is the only warranty made, and that HAL expressly disclaims all other warranties or agreements, including any implied warranties.  (*Id.*).  Additionally, sections 6.8 and 6.10 limit AAR's liability to the price paid by HAL for the services, and provide that AAR shall not be liable for consequential damages or lost profits because of any defect in its performance under the Agreement.  (*Id.*).

Mankiewicz never contracted with HAL to sell it any paint products for use in repainting HAL's 717s.  (MC Opp. R. 56.1 ¶54).  Instead, pursuant to HAL's instructions, EO and ESD, AAR submitted a series of Purchase Orders ("POs") to Mankiewicz to purchase its CF primer and paint products.  (DE 172, ¶40).  Mankiewicz responded by tendering a corresponding series of Order Confirmations ("OCs"), followed by delivery notes and invoices, setting forth the quantities, prices, and terms of the products purchased.  (DE 172, ¶40).  Certain of the POs referenced HAL or specific HAL aircraft tail numbers; however, these incidental references were included so that AAR would know to bill the invoice to HAL.  (MC Opp. R. 56.1 ¶41).  Neither the POs nor the OCs express any intent to benefit any third-party (in fact, HAL is not mentioned in Mankiewicz's OCs or delivery notes, nor is HAL mentioned in Mankiewicz's or AAR's "terms and conditions").[8]  (DE 172, ¶¶40, 41; MC Opp. R. 56.1 ¶¶40, 41).  On this issue, Mankiewicz corporate representative has stated that he intended Mankiewicz and AAR to be the primary beneficiaries of the agreements, not HAL.  (MC Opp. R. 56.1 ¶59).

In accordance with the Agreement, AAR stripped, put through a maintenance cycle, and repainted eleven (11) of HAL's 717s on a one-by-one rolling basis during 2010 – 2011.  (MC Opp. R. 56.1 ¶60).  AAR inspected and verified the repainting had been done in conformity with HAL's EO.  (MC Opp. R. 56.1 ¶61).  During this time, HAL also repainted certain of its 767s which, like the 717s, are older aircraft, using the exact same Mankiewicz paint system as was

---

[7] "Services" under the Agreement includes all "parts, materials, kits and components required to accomplish the work package."  (MC Opp. 56.1 ¶37).
[8] Additionally, Mankiewicz is not mentioned in the HAL/AAR Agreement, nor is it identified in the list of "approved subcontractor" contained therein.  (MC Opp. R. 56.1 ¶37).

SGR/13496068.4

used on the 717s (in fact, some of the paint batches overlapped).  (MC Opp. R. 56.1 ¶62).  However, the 767s were repainted by a different MRO, Delta Tech Ops, in Atlanta.  (MC Opp. R. 56.1 ¶62).  In 2012 and 2013, HAL began discovering what it characterizes as accelerated corrosion on its 717s repainted by AAR, but HAL admittedly is not experiencing accelerated corrosion problems on its 767's, and makes no claim against Mankiewicz relating to the 767's. (MC Opp. R. 56.1 ¶¶45, 63).

HAL contends that accelerated filiform corrosion on its 717s was caused by Mankiewicz's CF paint products.  (MC Opp. R. 56.1 ¶64).  Mankiewicz disputes this conclusion and the analyses relied upon by HAL to reach it.  In this regard, Andrew McMinn, P.E., one of Mankiewicz's corrosion experts, has concluded that the accelerated filiform corrosion on the fuselage of HAL's 717s was not due to the use of Mankiewicz's CF primer.  (MC Opp. R. 56.1 ¶65).  Instead, Mr. McMinn concludes that the corrosion is due to:  (1) paint system damage from service and/or maintenance actions by HAL, (2) paint system application defects as to coverage and quality by AAR, and (3) HAL's admitted failure to comply with its own wash/rinse protocol, which is part of HAL's corrosion prevention program.  (MC Opp. R. 56.1 ¶65).[9]  Additionally, HAL's 717s have had a history of corrosion problems dating back to 2003 (just after the 717s entered service), even when painted with Boeing OEM approved (chromated) primer and paint.  (MC Opp. R. 56.1 ¶67).

## MEMORANDUM OF LAW

### I.   Summary Judgment Standard

Rule 56(a), Federal Rules of Civil Procedure, provides that summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Partial summary judgment as to liability is inappropriate if a genuine issue of material facts exists as to any element other than the amount of damages.  *See, e.g., Pantages v. Cardinal Health 200, Inc.*, 2009 WL 2244536 at *4 (M.D. Fla. July 27, 2009).  A "court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th

---

[9] Further on the issue of causation, Mr. McMinn observed, reported, and documented filiform corrosion on the wings of HAL's 717s (which were painted with a chromated, non-Mankiewicz primer), and also on the fuselages of HAL's 717s that were stripped of Mankiewicz's paint system and repainted with a Boeing OEM approved chromated paint system within the past two years.  (MC Opp. R. 56.1 ¶ 65).

5

Cir.2000) (en banc). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff,* 274 F. App'x 839, 841 (11th Cir.2008). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Channa Imps., Inc. v. Hybur, Ltd.,* 2008 WL 2914977, at *2 (S.D.Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## II.     The Court Need Not Reach the Third-Party Beneficiary Claims and Analysis in HAL's Motion Because HAL Contractually Waived Such Claims

In the succeeding sections of the Memorandum, Mankiewicz conclusively demonstrates that HAL's Motion cannot be granted because: (1) HAL is not an intended third-party beneficiary of AAR and Mankiewicz's POs and OCs as a matter of law, or at the very least, that its standing to sue as a third-party beneficiary is a disputed issue of fact; (2) certain of the alleged warranties HAL sues upon do not exist; and (3) the facts relating to causation of the alleged accelerated corrosion are in dispute. However, Mankiewicz respectfully submits that the Court need not reach these issues because, as a threshold matter, HAL is bound by its Agreement with AAR which expressly limited HAL's rights and remedies for defects in the services AAR performed, including its purchase and application of Mankiewicz's paint products.

HAL never contracted directly with Mankiewicz for the purchase of paint. Instead, HAL entered into a negotiated, comprehensive Agreement with AAR to perform 439 separate tasks on eleven (11) of HAL's 717s, one of which was to **strip and repaint the exteriors of the aircraft and apply HAL's "livery."**[10] For these services, HAL paid a fixed unit price of $513,960.00 per aircraft, which included the price for AAR to purchase all materials, paint, parts, kits, and components necessary to perform the Agreement.

Pursuant to the Agreement and HAL's specific instructions and selections, AAR purchased Mankiewicz's CF primer and paint, among countless other materials specified in the Agreement but not manufactured by Mankiewicz, to perform the Agreement. Then, AAR or its subcontractors, were to strip the existing paint from the aircraft, clean the aircraft, apply a specified, non-Mankiewicz, pre-treatment, and then mix and apply the paint products it purchased from Mankiewicz to the 717s. This "task card," along with the 438 other tasks performed under the Agreement, was required to be done in accordance with HAL's EOs,

---

[10] In aviation terminology, "livery" means the paint scheme applied to an aircraft's exterior.

6

specifications, and instructions referenced in the Agreement.  After AAR performed this "task card" and completed the remaining 438 tasks, AAR redelivered to HAL a finished product, which it warranted was free and clear from defects and any and all claims, liens, mortgages or other encumbrances.  (MC Opp. R. 56.1 ¶37).  Simply put, this was a "package deal" between AAR and HAL for a ***completed product***, which ***included*** AAR purchasing and effectively reselling to HAL Mankiewicz's paint products (as applied to the 717s).  As such, HAL is bound by the bargained-for terms of the Agreement with respect to any defect in the services or materials provided, *including parts or the performance of such parts*.  *See Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F. Supp. 2d 311, 320 (W.D.N.Y. 2013) (parties to a contract may limit their respective remedies for breach of the contract).[11]

In this case, the Agreement contained an express limited warranty, a waiver and release by HAL of all other warranties, a limitation on HAL's remedies for any defects in AAR's services (including parts and materials) and a limitation on HAL's damages. In particular, sections 6.1 and 6.2 of the Agreement provide for a **six (6) month** limited warranty for defects in the services performed by AAR under the Agreement.  Additionally, in sections 6.7, 6.7A, and 6.10 of the Agreement HAL expressly disclaims all other warranties, including the implied warranties of merchantability and fitness for a particular purpose; waives any claims for lost profits or consequential damages; and limits its recovery to the price actually paid by HAL for AAR's services.

Based on the foregoing, HAL is barred from suing Mankiewicz on any breach of contract or breach of warranty theories for any damages caused by AAR's purchase or application of Mankiewicz's paint products to HAL's 717s.  Instead, HAL's exclusive contract and warranty-based remedies are the remedies expressly set forth in the Agreement.  These terms were bargained for with AAR, and are valid and enforceable.[12]  *See Xerox Corp.*, 959 F. Supp. 2d at 320.  In fact, HAL has pursued its available contractual remedies against AAR in this lawsuit and settled its claims.  Notably, *HAL did not make a claim to AAR during the six (6) month warranty period*, and did not assert such a claim against AAR in the Complaint (as it is *undisputed* that HAL did not begin to experience any alleged accelerated filiform corrosion until at least 1-2

---

[11] By its terms, the Agreement is governed by New York law, "without regard to any conflicts of laws principles."  (Sardinha Dep. Ex. 10, §11.7).

[12] Notably, the disclaimer of warranties is written and conspicuous.

years after AAR redelivered the aircraft to HAL).  HAL should not be permitted to "double-dip" on its recovery by suing Mankiewicz for claims and damages that HAL expressly waived and disclaimed in the Agreement.  *See generally Dravo Corp. v. Robert B Kerris, Inc.*, 655 F.2d 503, 510 (3rd Cir. 1981) (denying plaintiff's third-party beneficiary claims under a subcontract agreement w*hen plaintiff was covered by a separate contract* and a general payment bond, *and it appeared that the parties' intention was for the plaintiff to pursue claims under one of these express, bargained-for provisions, rather than as a third-party beneficiary*).

Notably, this conclusion comports with the parties' intended and expected contractual rights.  *See In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 21 F. Supp. 2d 593 (E.D.La. 1998) (denying plaintiffs' claims as an intended third-party beneficiary of a contract and concluding that, although the result was "harsh" in that it foreclosed all remedies to the homeowner plaintiffs, the homeowners "ought to answer for their own (inadequate) bargain.").  As in *Masonite*, HAL's is bound by its Agreement, and Mankiewicz cannot be sued for contractual or warranty-based claims where HAL contractually waived or limited such claims.  Moreover, unlike *Masonite*, HAL was not foreclosed as to all of its remedies, and in fact, has negotiated and obtained a settlement from AAR (and is also pursuing claims against Mankiewicz based upon alleged misrepresentations which are not the subject of HAL's Motion).  Accordingly, HAL's Motion should be denied in whole, without need for the Court to reach HAL's third-party beneficiary theories, which are based on agreements to which it is a stranger.

## III.  HAL's Third-Party Beneficiary Claims Fail

### A.  Legal Standard

It is well-accepted that a plaintiff generally cannot recover economic losses for breach of contract or breach of warranty in the absence of privity.  *See, e.g., David v. Am. Suzuki Motor Corp.*, 29 F.Supp.2d 1309, 1323 (S.D. Fla. 2009); *Mesa v. BMW of N. Am.*, 904 So.2d 450, 458 (Fla. 3d DCA 2005).  However, courts have created a narrow exception to this rule if the plaintiff is an *intended* third-party beneficiary of the contract.  *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981-82 (11th Cir. 2005) (emphasis added); *see also*, *Sanchez-Knutson v. Ford Motor Co.*, 2014 WL 5139306, at *10 (S.D. Fla. Oct. 7, 2014).[13]

---

[13] Whether a non-party to a contract has a right to maintain an action on a contract as a third-party beneficiary is a matter of state law.  *Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F.Supp.2d 1272, 1276 (M.D. Fla. 2008).  Mankiewicz agrees that Florida law governs this issue.

SGR/13496068.4

Under Florida law, a party is an intended third-party beneficiary only if the parties to the contract *clearly express*, or the contract itself *expresses*, an intent to primarily and directly benefit the third-party or a class of persons to which that party claims to belong. *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So.2d 1028, 1031 (Fla. 4th DCA 1994) (emphasis added). "If the parties had no such purpose in mind, any benefit from the contract reaped by the third-party is merely 'incidental,' and any third-party has no legally enforceable right in the subject matter of the contract." *Bochese*, 405 F.3d at 982.

The contracting parties' intent to benefit the third party must be *specific* and must be *clearly expressed* in order to endow the third party beneficiary with a legally enforceable right. *Id.* at 982 (*citing Am. Sur. Co. of N.Y. v. Smith*, 130 So. 440 (1930) (emphasis added); *see also Biscayne Inv. Grp. v. Guar. Mgmt. Servs., Inc.*, 903 So. 2d 251, 254-55 (Fla. 3d DCA 2006) (plaintiffs' arguments that they caused a homeowners' association to enter into a management agreement and participated in the hiring of the management company are of no consequence where the management agreement is silent and shows no intent to confer third party beneficiary status). Additionally, it must be established that both of the parties to the contract actually and expressly intended to benefit the third-party; "it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party." *Rebman*, 575 F.Supp.2d at 1277 (*citing Biscayne Inv. Group*, 903 So.2d at 254).

Importantly in this case, the contracting parties' knowledge that the contract will ultimately benefit, or that the work performed or services rendered will ultimately accrue to, an identifiable third-party is *insufficient* to transform a third-party that benefits from the contract into an "intended" third-party beneficiary. *See, e.g., Publix Super Markets, Inc. v. Cheesbro Roofing, Inc.* 502 So.2d 484, 488 (Fla. 5th DCA 1987) (superseded by statute on other grounds) (holding that a property owner is an incidental third-party beneficiary of a contract between a general contractor and subcontractor because, even though the work ultimately accrues to the owner, neither the contract nor anything else in the record clearly expressed an intent to primarily benefit the owner); *Rebman* 575 F.Supp.2d at 1277.

Federal courts in other jurisdictions have similarly concluded that, even though a third-party is referenced in a purchase order or agreement, the third-party is merely an incidental third-party beneficiary absent express evidence that the contracting parties intended to bestow a direct benefit on the third-party at the time the contract was created. *See, e.g. Tull Bros., Inc. v.*

SGR/13496068.4

*Peerless Prods., Inc.*, 953 F. Supp. 2d 1245, 1259 (S.D.Ala. 2013) (multiple specific references to a subcontractor window installer in a purchase order between general contractor and window manufacturer at best supported a finding that the subcontractor was an incidental beneficiary); *See also Dravo Corp.*, 655 F.2d at 510 (discussed in Section II, above).

An alleged third-party beneficiary has the burden to present <u>evidence</u> showing the <u>clear intent</u> of the parties to the contract to directly and primarily benefit the third-party. *Rebman*, 575 F. Supp. 2d at 1277 (emphasis added). A purported third-party beneficiary cannot rely on mere opinion or belief, or general allegations of intent, to move for, or oppose, entry of summary judgment. *See Id.*; *Hill v. Celebrity Cruises, Inc*., 2011 WL 5360247 (S.D. Fla. Nov. 7, 2011).

**B.    HAL Was Not an Intended Third-Party Beneficiary of AAR's Purchases of Paint Products from Mankiewicz**

HAL's contract and warranty claims all require an initial finding that HAL was, in fact, an intended third-party beneficiary of AAR's purchases of Mankiewicz's paint products. As such, each of HAL's claims fails because neither Mankiewicz's and AAR's purchase documents, nor their dealings, express a clear intent to primarily and directly benefit HAL.

First, Mankiewicz's OCs do not express an intent by Mankiewicz or AAR to directly and primarily benefit HAL. In fact, Mankiewicz's OCs express an intent that it and AAR are the only intended beneficiaries of the purchase documents, as Mankiewicz's terms and conditions do not reference HAL, prohibit assignment of the agreement without Mankiewicz's written consent, and contain a merger cause.[14]

Similarly, AAR's POs do not express an intent to bestow a direct or primary benefit on a party other than itself or Mankiewicz. HAL's argument that AAR's references to HAL or certain HAL tail numbers on the "PO Notes" line of the POs demonstrate that it is an intended third-party beneficiary is contrary to the record evidence. Specifically, AAR's corporate representative testified that the *references to HAL in the PO Notes line were only made so that AAR would know to bill HAL for the paint products purchased* – not to bestow any third-party rights or benefits on HAL. (MC. Opp. R. 56.1 ¶41). Moreover, mere reference to a third-party in a contract confers nothing more than status as an *incidental* third-party beneficiary, and does

---

[14] The merger clause provides that "[t]his Agreement represents the entire agreement between the parties and is a final, complete, and exclusive statement of the terms thereof. The parties have not made or relied upon any representations, understandings, or other agreements not specifically set forth herein." (MC. Opp. R. 56.1 ¶40).

SGR/13496068.4

not constitute an expression of *specific and clear intent* to primarily benefit the third-party. *See Bochese*, 405 F.3d at 982-83; *Peters v. Keyes Co.*, 2010 WL 1645095, at * (S.D. Fla. April 21, 2010) (mention of broker's rights in purchase contact insufficient to find broker was an intended third-party beneficiary); *Tull Bros., Inc.*, 953 F. Supp. 2d. at 1259-60). It is indisputable that the POs and OCs do not express such a specific and clear intent.

Second, HAL cannot demonstrate that AAR or Mankiewicz (much less both) expressed a clear intention to primarily and directly benefit HAL at the time the POs and OCs were exchanged. There is absolutely no record evidence that the intent of AAR in submitting the POs was motivated by anything other than AAR's need to perform under its Agreement with HAL, and Mankiewicz sold its paint products to AAR to primarily and directly benefit itself and AAR, not HAL. (MC. Opp. R. 56.1 ¶58). The fact that both parties knew the paint would ultimately be used on HAL's 717s (along with countless other parts and materials) is insufficient to transform HAL into an intended beneficiary. *Cheesbro*, 502 So.2d at 488. Similar to the property owner in *Cheesbro*, HAL is nothing more than an incidental beneficiary of the agreements between AAR (general contractor) and Mankiewicz (subcontractor). *Id* at 488.

Moreover, the terms of HAL's express Agreement with AAR further support the conclusion that AAR did not intend to primarily and directly benefit anyone other than itself by purchasing Mankiewicz's paint products. As set forth above, AAR was obligated to perform 439 separate tasks on HAL's 717s under the Agreement, including stripping and repainting the aircraft exteriors (which required the purchase of Mankiewicz's paint products, among other materials). HAL and AAR agreed to specific remedies against AAR if it failed to perform, or if its performance was defective. As such, and contrary to HAL's argument, AAR was the party that directly and primarily benefited from communicating with Mankiewicz to ensure it ordered and timely obtained the proper paint products, and learned how to properly mix and apply them, in that it allowed AAR to perform under the Agreement. Additionally, Mankiewicz was just one of many vendors AAR purchased materials from in connection with the Agreement, and, notably, Mankiewicz is not even listed as an "approved subcontractor" in the Agreement. (MC. Opp. R. 56.1 ¶37). Thus, HAL's Agreement with AAR further requires a finding that HAL was not an intended third-party beneficiary of AAR's purchase of Mankiewicz's paint products.

Finally, HAL's conclusory argument that its discussions with Mankiewicz, its coordinating telephone conferences with AAR and Mankiewicz, and Mankiewicz's

11

representatives training AAR on how to mix and apply the paint, somehow show that the purchases were made to primarily benefit HAL are unavailing and based on pure speculation. As discussed above, AAR and Mankiewicz had clear self-interests in engaging in these activities, and HAL presents no cogent argument as to why these activities would transform it into an intended third-party beneficiary. *Rebman*, 575 F. Supp. 2d at 1278 (prospect of continued business with customers is not evidence of the intent to directly benefit those customers).

Therefore, HAL's Motion should be denied because the material facts show that HAL is <u>*not*</u> an intended third-party beneficiary, as a matter of law. Additionally, Mankiewicz respectfully submits that, based on the record evidence and applicable law, the Court would be justified in considering the entry of judgment on this issue in its favor under Rule 56(f).

### C. Alternatively, the Court Should Deny HAL's Motion Because Genuine Issues of Fact Exist as to Whether HAL is an Intended Third Party Beneficiary.

As set forth above, Mankiewicz submits that the undisputed material facts demonstrate that HAL was not an intended third-party beneficiary of AAR's purchases from Mankiewicz. However, to the extent the Court may perceive some merit to HAL's legal position, HAL's Motion should nevertheless be denied because, at a minimum, genuine issues of material fact exist and the issue should be submitted to a jury. *See Searce v. O.M. Wilson Moving and Trucking Co.*, 516 So. 2d 278, 279 (Fla. 5th DCA 1987) (whether a plaintiff is an intended third-party beneficiary of a contract is an issue of fact). Here, at a minimum, material issues of fact exist as to whether AAR's mere reference to HAL in some of its POs constitutes a clear expression of intent to primarily and directly benefit HAL, especially in light of AAR's testimony on this issue which contradicts HAL's claims, and is, in fact, consistent with Mankiewicz's testimony on the issue. Additionally, material issues of fact exist as to whether AAR and Mankiewicz clearly expressed an intent to primarily and directly benefit HAL at the time they exchanged their respective POs and OCs simply by discussing the paint products with HAL, particularly when no record evidence exists as to AAR's intent, and AAR entered into a separate, comprehensive Agreement with HAL that contained express limited remedies for AAR's failure to obtain the paint products and properly apply the same.

Thus, at a minimum, genuine issues of fact exist as to whether HAL was an intended third-party beneficiary of AAR's purchases of Mankiewicz's paint products. Accordingly, HAL's Motion must be denied.

SGR/13496068.4

**IV.**   **Mankiewicz Did Not Breach Its Purchase Documents with AAR, and No Express Warranty or Implied Warranty of Fitness for a Particular Purpose Exist Therein**

Even assuming, *arguendo*, that there is sufficient evidence to justify submitting the question of whether HAL was an intended third-party beneficiary to a jury and that HAL can circumvent the terms of its Agreement with AAR, HAL's Motion should nevertheless be denied because Mankiewicz's and AAR's purchase documents do not, as HAL contends, contain an express warranty or an implied warranty of fitness for a particular purpose, and there is no evidence that Mankiewicz breached any express provision of the documents or the implied warranty of merchantability.

**A.**   **The Terms of the AAR Purchases**

Mankiewicz and AAR did not enter into a formal agreement for the sale of Mankiewicz's paint products.  Instead, as set forth above, AAR and Mankiewicz submitted POs and OCs to each other with their respective terms and conditions attached, Mankiewicz delivered the order to AAR, and AAR paid Mankiewicz.  Courts employ section 2-207 of the U.C.C. in this situation to determine whether a contract was formed, and if so, the terms of such contract.  *See Option Wireless, Ltd. v. OpenPeak, Inc.*, 2012 WL 6045936, at *4 (S.D. Fla., Dec. 5, 2012); *Premix-Marbletite Mfg. Corp. v. SKW Chems., Inc.*, 145 F. Supp. 3d 1348, 1354-55 (S.D. Fla. 2001).

Pursuant to § 2-207,[15] a contract may be formed in three ways.  First, the parties can exchange forms with divergent terms.  Here, if the offeree's acceptance or written confirmation is not made "expressly conditional" on the offeror's assent to the additional or different terms, a contract is formed under § 2-207(1).  *Option Wireless, Ltd.*, 2012 WL 6045936, at *4.  Acceptance is "expressly conditional" on an offeror's assent to additional or different terms if the acceptance tracks the language of the statute or expresses the intent to condition acceptance in "no uncertain terms."  *Id.* at *6.

If a contract is formed under § 2-207(1), then § 2-207(2) is used to determine the terms of the contract.  *Id.*   Under § 2-207(2), *additional* terms become part of the contract between merchants unless:  (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to the additional terms has already been given or is given within a reasonable period of time after notice of them is received.  Fla. Stat. § 672.207(2).  "*Different*" terms, however, are assumed to constitute mutual objections to each

---

[15] Florida has adopted the Article 2 of the Uniform Commercial Code through Fla. Stat. §§ 672.101, *et seq.*, including U.C.C. § 2-207 in § 672.207.

other, causing a "mutual knockout" of both parties' terms, and U.C.C. "gap filler" provisions fill in the blanks. *Option Wireless, Ltd.*, 2012 WL 6045936, at *8.

Second, "if the offeree's expression of acceptance or written confirmation is made "expressly conditional" on the offeror's assent to the additional or different terms, then the acknowledgment is treated merely as a counteroffer." *Option Wireless*, 2012 WL 6045936, at *4. Under this scenario, "[a] contract could only be formed . . . upon the original offeror's expression of affirmative acceptance of the counteroffer." *Id.*

Third, "where the first two possible avenues do not result in contract formation, a contract may nevertheless be formed via § 2-207(3) where the conduct of the parties demonstrate a belief that a contractual agreement was formed." *Id.* Accordingly, a contract can only be formed under § 2-207(1) or 2-207(3), but not both provisions. *Id.* at *5.

In this case, Mankiewicz agrees that the exchange of POs and OCs between it and AAR contain terms for the sale of the specific paint products referenced in the respective POs and OCs pursuant to Fla. Stat. § 672.207(1).[16] These documents are clear as to the price, quantity, and type of paint products sold, and these issues are not in dispute. Instead, the relevant question to be determined is what warranties, if any, are included in the documents. On this issue, Mankiewicz strongly disputes HAL's conclusion that "the terms of the contract consisted of either the warranty provision in AAR's POs or the warranty U.C.C. gap-fillers." As set forth below, regardless of whether the Court determines that the contracts were formed pursuant to §§ 2-207(1) or 2-207(3), the warranty provisions contained in AAR's POs do not apply.

Pursuant to § 2-207(2), AAR's and Mankiewicz's warranty provisions are "different" terms that are "knocked out" of the agreements. AAR's warranty provision provides that "all goods and services when delivered will be merchantable and free from defects in workmanship and material, will conform strictly to the specifications . . . herein . . . and will be fit for their ordinary and intended purposes and any special purposes specified by Buyer." (Dietz Dep., Ex. 74). Comparably, Mankiewicz's warranty provision provides that "the products will be free from defects in material for a period of one (1) year from the date of shipment of such Product," and expressly and conspicuously disclaims all other warranties, including the implied warranties

---

[16] Mankiewicz's OCs provide that "[a] contract shall become effective only if Buyer submits an order/offer to Seller and Seller accepts the same, subject to the terms set forth herein." Mankiewicz submits that this language constitutes an acceptance of the POs under § 2-207(1), as opposed to a counter-offer. *See Option Wireless*, 2012 WL 6045936, at *4-6.

SGR/13496068.4

of merchantability and fitness for a particular purpose. (*Id.*). Accordingly, these warranty provisions are inconsistent, and are "knocked out" and replaced by the U.C.C. gap-fillers. *See Tyco Elec. Corp. v. Milwaukee Elec. Tool Corp.*, 2012 WL 4793745 at \*3 (M.D. Pa. 2012) (different terms are those for which a comparable term exists, but the terms are inconsistent).

Therefore, the agreements entered into between AAR and Mankiewicz contain the U.C.C. gap-filler warranty of merchantability provided in § 2-316. However, the warranty provisions in AAR's POs do **not** apply under a proper U.C.C. § 2-207 analysis, and HAL's argument for the same is meritless.[17]

### B. Mankiewicz Has Not Breached the Terms of Any Purchase Documents Between It and AAR.

Separate from HAL's third-party beneficiary breach of warranty claims, HAL has asserted and moved for summary judgment on its claim for breach of third-party beneficiary contract (Count II). Specifically, Count II of the Amended Complaint alleges that Mankiewicz breached its agreements with AAR by "supplying paint products that did not comply with the applicable requirements and specifications, including FAA requirements, were not OEM approved, and were not able to meet HAL's specific operational needs." (DE 27, ¶ 28).

It is axiomatic that to prevail on a claim for breach of contract, a plaintiff must, in fact, demonstrate the existence and breach of a specific provision of the contract. *See Kaiser v. Depuy Spine, Inc.*, 944 F.Supp.2d 1187, 1193 (M.D. Fla. 2013). Here, it is indisputable that AAR's POs and Mankiewicz's OCs *do not* provide that the paint sold would comply with any "applicable requirements and specifications, including FAA requirements," that it would be Boeing OEM approved, or that it would meet HAL's specific operational needs. Instead, the agreed-upon, operative terms simply provide that Mankiewicz would sell AAR the paint products AAR specifically ordered at the price and quantities ordered. Moreover, HAL's allegation that the "agreements" provided that the paint would be OEM approved is contradicted by HAL's own admission that it selected Mankiewicz's paint system for use on its 717s knowing that it was not Boeing OEM approved. Thus, the alleged contractual provisions HAL claims Mankiewicz "breached" do not exist, and are contrary to the parties' understanding and record evidence.

---

[17] HAL's citation to *Stemcor USA, Inc. v. Trident Steel Corp.*, 471 F. Supp. 2d 362, 269 (S.D.N.Y. 2006) on this point is misdirected. In *Stemcor*, the Court merely held that an *additional* arbitration provision in an acknowledgment did not become part of a contract under § 2-207 because the offer limited acceptance to the terms of its purchase order. *Stemcor*, however, does not hold that an offeror's terms control when the parties' terms differ.

Furthermore, Count II fails because Mankiewicz has not breached any terms contained in its agreements with AAR.  Specifically, there is no record evidence that Mankiewicz failed to timely deliver the paint products ordered by AAR in the quantities specified, or otherwise breached any terms of the AAR/Mankiewicz purchase order documents.  Accordingly, HAL's Motion with respect to Count II should be denied, and Mankiewicz respectfully submits that, based on the record evidence and applicable law, the Court would be justified in considering the entry of judgment on this issue in Mankiewicz's favor under Rule 56(f).

      **C.**      **HAL's Express Warranty Claim Fails.**

HAL's claim for breach of express warranty (Count V) fails as a matter of law because the undisputed facts and record evidence demonstrate that no express warranty existed between AAR and Mankiewicz, and, even if one did exist, there is no record evidence that Mankiewicz breached such a warranty.

As set forth above, HAL's only basis to claim breach of an express warranty against Mankiewicz is as a purported third-party beneficiary of the agreements between Mankiewicz and AAR.  *David*, 29 F.Supp.2d at 1323; *Bochese*, 405 F.3d at 981-82.  As such, and by HAL's own theory of recovery, HAL stands in AAR's shoes under the purchase documents.  *See Consol. Bathurst v. Rederiaktiebolaget ETC.*, 645 F. Supp. 884, 887 (S.D. Fla. 1986).   Here, the express warranty provisions contained in the POs and OCs "knocked each other out" pursuant to U.C.C. § 2-207, and only the U.C.C. gap-filler warranties apply.  With respect to express warranties, section 672.313, Florida Statutes, provides that:

(1)     Express warranties by the seller are created as follows:

     (a)   Any affirmation of fact or promise made by the seller **to the buyer** which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
     (b)   Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
     (c)   Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(Emphasis added).   "The requirement that a statement be part of the basis of the bargain 'is essentially a reliance requirement and is inextricably intertwined with the initial determination as to whether given language may constitute an express warranty since affirmations, promises and descriptions tend to become part of the basis of the bargain.'" *Royal Typewriter Co. v.*

16

*Xerographic Supplies. Corp.*, 719 F.2d 1092, 1101 (11th Cir. 1983) (*citing Royal Bus. Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34, 44, n.7 (7th Cir. 1980)).  Additionally, a buyer's knowledge, or absence of reliance, will negate the existence of an express warranty.  *Id.*

In the instant case, the record is entirely devoid of any evidence that Mankiewicz made any statements to AAR as to the suitability of its paint products for HAL's 717s.  In fact, AAR testified that it did not communicate with Mankiewicz regarding paint selection.  Instead, HAL alleges *ad nauseum* that Mankiewicz made certain representations **_to HAL_** regarding the suitability of its paint products for use on its 717s.  If these statements had been made to HAL (which Mankiewicz denies), they would only pertain to HAL's claim for misrepresentation (Count VII),[18] and do not constitute an express warranty **_made to AAR_** or confer on HAL any greater rights against Mankiewicz than AAR has under the purchase documents.  *See Seaboard Sur. Co. v. Garrison, Webb, & Stanaland, P.A.*, 823 F.2d 434 (11th Cir. 1987) (third-party beneficiary's right can rise no higher than that of the promissee).  Thus, no express warranty between AAR and Mankiewicz existed, and HAL's claim for breach of any express warranty as a third-party beneficiary consequently fails.

Moreover, even assuming hypothetically that express warranties were made to AAR (which the record does not support), AAR clearly did not rely on them.  Again, AAR made its decision to purchase Mankiewicz's paint products based on HAL's instructions and its EO incorporated in the Agreement.  As such, any possible "warranties" which could have been made to AAR were not part of the basis of the bargain for AAR's purchase of Mankiewicz's paint, and AAR undisputedly did not rely on them.  *See Royal Typewriter Co.*, 719 F.2d at 1101.  Thus, based upon the foregoing, no express warranty to AAR existed.  Accordingly, HAL's Motion with respect to this Count should be denied, and, Mankiewicz respectfully submits that, based on the record evidence and applicable law, the Court would be justified in considering the entry of judgment on this issue in Mankiewicz's favor under Rule 56(f).

### D.  HAL's Claim for Breach of Implied Warranty of Fitness for a Particular Purpose Fails.

Again, Florida law requires privity of contract to sustain a breach of implied warranty claim, and no such privity exists between HAL and Mankiewicz.  As such, HAL's only basis to sue for breach of the implied warranty of fitness for a particular purpose (Count IV) is under the

---

[18] HAL has not moved for summary judgment on this claim.

theory that it is a third-party beneficiary of any such implied warranty that exists between AAR and Mankiewicz, and HAL stands in AAR's shoes for such claims.  Florida Statute § 672.315 provides that "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required **and that the buyer is relying on the seller's skill or judgment** to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." (emphasis added).  Courts interpreting this provision have consistently rejected claims for breach of the implied warranty of fitness for a particular purpose when the buyer did not rely on the seller in determining what product to purchase.  *See, e.g.*, *Czarnecki v. Roller*, 726 F. Supp. 832, 844-45 (S.D. Fla. 1989) (buyer based his decision to purchase yacht on his own inspections, sea trials, and acceptable marine surveys); *Two Rivers Co. v. Curtiss Breeding Serv.*, 624 F.2d 1242, 1252 (5th Cir. 1980) (plaintiff's claim for breach of implied warranty of fitness for particular purpose failed because it relied on third party, not seller, to select product to be purchased).

HAL's claim for breach of the implied warranty of fitness for a particular purpose fails because no such warranty existed between Mankiewicz and AAR.  Specifically, it is undisputed that ***AAR*** did not seek or rely upon Mankiewicz's skill or judgment in selecting any paint products to purchase or whether such paint products were suitable for use on HAL's 717s.  Instead, HAL's own qualified engineering team prepared detailed EOs and ESDs for AAR to follow, including specifying the particular materials that HAL wanted AAR to purchase and use to strip and repaint the exteriors of HAL's 717s.  These were referenced in HAL's Agreement with AAR, and AAR followed them in purchasing Mankiewicz's paint products.  In this regard, AAR testified that it did not communicate with Mankiewicz regarding the selection of the paint products, and HAL has failed to submit any record evidence to the contrary.

Based on the foregoing, HAL's claim against Mankiewicz for breach of the implied warranty of fitness for a particular purpose fails, as a matter of law.  Therefore, the Court should deny HAL's Motion on this Count, and Mankiewicz respectfully submits that, based on the record evidence and applicable law, the Court would be justified in considering the entry of judgment on this issue in Mankiewicz's favor under Rule 56(f).

### E.  Mankiewicz Did Not Breach Any Implied Warranty of Merchantability

As with its claim for breach of implied warranty of fitness for a particular purpose, HAL's only basis to sue for breach of the implied warranty of merchantability (Count III) would

be as a third-party beneficiary of the purchase documents between AAR and Mankiewicz. Section 672.316(1), Florida Statutes provides that a warranty that goods sold shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  "Chapter 672.314(2) defines the term 'merchantability' and states that it includes an implied warranty that the goods are fit to use for their normal services or acceptable in the trade and are of fair average quality." *MAAS Bros. Inc. v. Vincent*, 10 B.R. 549, 552 (M.D. Fla. Bankr. 1981); *see also Royal Typewriter*, 719 F.2d at 1099 (to be merchantable, goods must have passed without objection in the trade under the contract description, be of fair average quality, and be fit for the ordinary purposes for which such goods are used).

Here, there is no record evidence that Mankiewicz's CF paint system was defective when sold, would not have passed without objection in the trade at the time it was sold, or was not fit for the ordinary purposes for which it is used.  Instead, HAL argues that the paint system was not fit for a specific purpose – use on HAL's 717s.  HAL's lack of evidence as to whether the paint products were "merchantable" when sold to AAR requires denial of its Motion.

Moreover, even construing HAL's arguments as possibly supporting a claim for breach of the warranty of merchantability, the record evidence in this case demonstrates that, at a minimum, genuine issues of material fact exist on this claim.  Specifically, it is undisputed that Mankiewicz's paint system is approved to AMS 3095, is applied to new Airbus A330s, and has been used on Boeing aircraft, including HAL's 767s, without any issues.  Thus, at a minimum, genuine issues of material fact exist as to whether Mankiewicz's paint system was merchantable when it was sold.  Therefore, HAL's Motion on this claim should be denied.

## V.    HAL's Motion Should be Denied Because Genuine Issues of Fact Exist as to Causation

Regardless of what warranties may exist between Mankiewicz and AAR, HAL's Motion should be denied because a genuine issue of material fact exists on whether Mankiewicz's paint products *caused* accelerated corrosion on HAL's 717s.[19]  As set forth above, partial summary judgment as to liability is inappropriate unless the movant proves every element other than

---

[19] To the extent HAL's claim under the MMWA is included in its Motion, the claim fails for this same reason.  Additionally, HAL's claim under the MMWA fails as a matter of law because HAL is not a "consumer" as defined under the MMWA, which is dispositive of its claim, and the paint products sold by Mankiewicz are not normally used for personal, family, or household purposes.  (MC Opp. R. 56.1 ¶54).  Mankiewicz will address this claim in more detail in its forthcoming motion for summary judgment.

19

amount of damages.  Under Florida law, actions for breach of express and implied warranties require a plaintiff to prove, as an essential element, that the alleged defect caused the plaintiff's injuries.  *See Bowers v. N. Telecom, Inc.*, 905 F. Supp. 1004, 1006 (N.D. Fla. 1995); *In re Trasylol Prod. Liab. Lit.*, 2013 WL 3353833, at *3 (S.D. Fla. 2013).

Causation of the filiform corrosion is a highly disputed and critical issue in this case and is the proper subject of expert testimony.  (DE 81, p. 8:5-8).  Mankiewicz contends that its paint products did not cause any alleged accelerated corrosion on HAL's 717s and offers substantial evidence on this point, including, *inter alia*:  (1) Boeing 717s have had a long history of filiform corrosion issues even with Boeing OEM approved chromated paint products; (2) expert opinions that HAL failed to properly clean and maintain its 717s to avoid accelerated corrosion; (3) expert opinion that the corrosion was the result of AAR's failure to properly strip, clean, and pre-treat the aircraft and to properly apply the primer and paint products (4) expert opinion that HAL damaged the paint system during service and/or maintenance actions; and (5) the same paint system has been used on HAL 767s and other Boeing aircraft, which have not experienced accelerated corrosion.  (MC Opp. R. 56.1 ¶¶ 65, 67).

Conversely, HAL does not cite any record evidence, expert or otherwise, to support the conclusion that Mankiewicz's paint products, in fact, caused the accelerated corrosion to its 717s.  Instead, HAL side-steps this issue by focusing on the fact that Mankiewicz's paint system was not "Boeing approved" (which HAL admittedly knew when it selected the paint system); or that Mankiewicz's paint system was chromate free (which HAL also admittedly knew when it selected the paint system).  Accordingly, this issue is contested, and as such, HAL's Motion should be denied in its entirety.

## CONCLUSION

For the foregoing reasons, Mankiewicz respectfully requests that this Court deny in its entirety HAL's Motion for Partial Summary Judgment and enter partial summary judgment in Mankiewicz's favor on the specific claims requested herein.

## REQUEST FOR HEARING

Mankiewicz hereby requests a hearing on HAL's Motion in order to allow Mankiewicz to address any arguments raised in HAL's Motion or reply, and to answer any questions the Court may have. It is estimated that 2 hours would be sufficient (1 hour per side).

20

**SMITH, GAMBRELL & RUSSELL, LLP**
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Telephone:  (904) 598-6127
Facsimile:  (904) 598-6227

s/ James H. Cummings
Dana G. Bradford II
Florida Bar No.: 167542
dbradford@sgrlaw.com
apelegrin@sgrlaw.com
James W. Middleton
Florida Bar No.: 508152
jmiddleton@sgrlaw.com
tgreene@sgrlaw.com
James H. Cummings
Florida Bar No.: 27657
jcummings@sgrlaw.com
apelegrin@sgrlaw.com
*Attorneys for Defendant Mankiewicz Coatings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 22, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert C. Owens, Esq.
Robert C. Owens, P.A.
18890 SW 264th Street
Miami (Homestead), Florida 33031
bobowens@avlaw.com

*Attorneys for Plaintiff Hawaiian Airlines, Inc.*

Christopher R. Christensen, Esq.
cchristensen@condonlaw.com
Anthony U. Battista, Esq.
abattista@condonlaw.com
Nicole M. Smith, Esq.
nsmith@condonlaw.com
Evan Kwarta, Esq.
ekwarta@condonlaw.com
Condon & Forsyth LLP
7 Times Square
New York, New York 10036
*Attorney for Plaintiff Hawaiian Airlines, Inc.*

s/ James H. Cummings
James H. Cummings

21

SGR/13496068.4