UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-20560-CIV-MOORE/MCALILEY

HAWAIIAN AIRLINES, INC.

      Plaintiff,

v.

AAR AIRCRAFT SERVICES, INC., f/k/a
AAR AIRCRAFT SERVICES - MIAMI,
INC., and MANKIEWICZ COATINGS,
LLC

      Defendants.

_____/

## MANKIEWICZ COATINGS, LLC'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

**INTRODUCTION:  THE MOTION FOR SUMMARY JUDGMENT**

In this lawsuit, Hawaiian Airlines, Inc. ("HAL") seeks damages against Mankiewicz Coatings, LLC ("Mankiewicz") relating to alleged accelerated filiform corrosion sustained on the fuselages of eleven (11) of its Boeing B-717 aircraft (the "717s").  HAL's claims are primarily based on allegations that Mankiewicz made certain factual misrepresentations to HAL regarding the suitability of Mankiewicz's chromate-free ("CF") paint products for use on HAL's fleet of 717s, upon which it relied to select the Mankiewicz CF system for use on those aircraft.  Based on these allegations, HAL has asserted various statutory, contractual, warranty, and misrepresentation claims against Mankiewicz.  (DE 27).  Mankiewicz hereby moves, pursuant to Rule 56, Fed. R. Civ. P., for summary judgment on each of HAL's claims for relief.

**STATEMENT OF MATERIAL FACTS AND PROCEDURAL HISTORY**

Mankiewicz is a South Carolina based company that sells and distributes commercial paint products manufactured in Germany for a variety of applications in the aviation, marine, and automotive industries, among others.  (MC R. 56.1 ¶ 1).[1]  Mankiewicz's aviation paint products are exclusively marketed and sold by Mankiewicz to commercial maintenance and repair organizations ("MROs"), commercial airlines, and related commercial entities for application to commercial aircraft.  (Id.).

In 2008, HAL purchased several Airbus A330 aircraft.[2]  (MC R. 56.1 ¶ 3).  Through this purchase, Christina Tredway (one of HAL's staff of engineers), among other HAL representatives, learned from Airbus in Toulouse, France, that Mankiewicz's CF primer and paint was used on HAL's A330s, and that the paint system was Airbus Original Equipment Manufacturer ("OEM") approved.  (Id.).  HAL's engineers learned and were impressed by the fact that the Mankiewicz paint system was lighter, dried quicker, had superior color retention, and was safer for the environment than systems using chromate-based primers.  (Id.).

In 2009 HAL decided to repaint its existing fleets of Boeing 717s and 767s due to fading and discoloration issues, and wanted to use a uniform paint system.  (MC R. 56.1 ¶ 4).  As such, Ms. Tredway and Phong Lai of Mankiewicz arranged a meeting in Hawaii to discuss extending

---

[1] Citations to Mankiewicz's Rule 56.1 Statement will be abbreviated as "(MC R. 56.1 ¶ _)."

[2] HAL is a commercial airline based in Honolulu, Hawaii, operating as a common carrier and certificate holder pursuant to the Federal Aviation Administration Regulations ("FARs").  (MC R. 56.1 ¶ 2).  Airbus is a major manufacturer of commercial aircraft headquartered in France.

the use of Mankiewicz's CF primer system on HAL's 717 and 767 fleets.[3]  (Id.).

On August 3, 2009, two representatives of Mankiewicz (its Managing Director, Peter Dietz, and its Director of Sales and Marketing, Aviation, Phong Lai) flew to HAL's headquarters in Honolulu, to discuss the possible use of Mankiewicz's CF paint products on HAL's Boeing fleets.  (MC R. 56.1 ¶ 6).  At the Honolulu meeting, Mankiewicz marketed its CF paint system in a PowerPoint presentation to a group of HAL attendees (including Ms. Tredway), informing them that the Mankiewicz CF paint system was Airbus OEM approved (which it was), but not Boeing OEM approved.  (Id.).  On this point, HAL admits that its team of engineers had access to and were familiar with the 717 maintenance manuals, and knew Mankiewicz's CF primer system was (1) chromate-free, (2) not Boeing OEM approved, and (3) not included in Boeing's Qualified Parts List ("QPL") of the 717 maintenance manual.  (MC R. 56.1 ¶ 10).

A few hours after the August 3rd presentation, Ms. Tredway emailed Mr. Lai a draft of HAL Engineering Specification Document 51002 ("ESD"), which approved two options for the exterior repaint of its Boeing aircraft.  (MC R. 56.1 ¶ 7).   Option 1 specified Mankiewicz's CF primer, basecoat, and clearcoat paint system for use on the 717 and 767 aircraft as the "preferred method of paint."  (Id.)  Option 2 approved a chromated primer and paint system, and noted that the primer was DMS 2104 (Boeing OEM) approved.[4]  (Id.).  On August 17, 2009, Mankiewicz provided HAL's engineering team in Hawaii with the test data showing that its CF primer system complied with (1) Airbus specifications and (2) Aerospace Material Specification 3095 ("AMS 3095").[5]  (MC R. 56.1 ¶ 8).  One of HAL's engineers (and corporate representative), Dan Smith, reviewed this data (which HAL admits was correct), and, in October 2009, reviewed and approved the ESD specifying Mankiewicz's CF paint system as the "preferred method" for repainting HAL's 717s.  (Id.).  In this regard, Mr. Smith testified that he relied on test data, not sales presentations, when reviewing and signing-off on the ESD.  (Id.).

When deposed, neither Mr. Smith nor anyone else from HAL could identify specific statements from Mankiewicz in 2009 that its CF primer system was Boeing (DMS 2104)

---

[3] The 717 aircraft is a commercial aircraft.  (MC R. 56.1 ¶ 5).

[4] The 717 is a McDonnell-Douglas MD-95 legacy aircraft that Boeing rebadged when it merged with McDonnell-Douglas in 1997.  (MC. R. 56.1 ¶ 5).  As such, the filiform corrosion testing specifications applicable to the 717 are Douglas Material Specifications (DMS 2112 / DMS 2104"), as opposed to Boeing Material Specification 10-72 ("BMS 10-72").  (Id.).

[5] AMS 3095 is a "universal" specification applicable to some Boeing and Airbus exterior aircraft coatings.  (MC. R. 56.1 ¶ 8).

SGR/13533233.4

approved, or had successfully met that test specification. (MC R. 56.1 ¶ 10). Moreover, it is undisputed that HAL had an ongoing, decades-long relationship with Boeing for Boeing and legacy McDonnell-Douglas aircraft, and had previously called Boeing personnel with questions or concerns, including questions regarding the use of paint products on its aircraft. (Id.). HAL could have asked Boeing whether Mankiewicz's CF paint system, were Boeing OEM approved for the 717, or would meet HAL's particular needs, but chose not to do so. (Id.).

HAL's ESD required applicators to follow Mankiewicz's application guides for its Seevenax CF primer and Alexit products (the "Application Guides"), in repainting the aircraft. (MC R. 56.1 ¶ 11). The Seevenax Application Guide for Mankiewicz's CF primer specified that for aircraft with aluminum exteriors (HAL's 717s and 767s) a "chromate conversion coating (Alodine 1000, 1200, or 1200S)" must be applied according to manufacturer's instructions as a pretreatment to the aircraft before the [Mankiewicz] primer is applied."[6] (Id.). Thus, the paint system or "stackup" (in industry parlance) approved by HAL in 2009 for use on its 717s consisted of a _chromated_ pre-treatment (Alodine), followed by Mankiewicz's CF primer, basecoat and clearcoat paint products. (Id.).

On November 17, 2009, HAL contracted with AAR Aircraft Services, Inc. ("AAR"), a maintenance, repair and overhaul ("MRO") company located in Miami, to perform, as the general contractor, a general refurbishment, consisting of 439 maintenance and repair "tasks," on eleven (11) of HAL's 717s (the "Agreement").[7] (MC R. 56.1 ¶ 12). One of the tasks was entitled "717 Hawaiian Airlines' External Aircraft Painting," which referenced HAL's Engineering Order ("EO") 11-08-06-12 and described the task as "Strip and Paint Exterior and Application of HAL Exterior Livery." (Id.). (Id.). EO 11-08-06-12 was prepared by HAL, and referenced HAL's ESD selecting Mankiewicz's CF paint system for use in repainting the 717s. (Id.).

AAR's Agreement provided a six (6) month limited warranty to HAL relating to the services performed and goods sold by AAR, including parts and materials AAR used to perform the required work. (MC R. 56.1 ¶ 13). Specifically, Section 6.1 of AAR's Agreement states:

---

[6] Alodine is a chromated pretreatment not manufactured by Mankiewicz. (MC R. 56.1 ¶ 11). Chromate is the primary chemical in paint products that inhibits corrosion. (MC R. 56.1 ¶ 3).
[7] HAL initially sued AAR and Mankiewicz in this lawsuit relating to corrosion on the wings of the 717s (allegedly caused by poor workmanship, application errors and other deficiencies in the work performed by AAR), but settled its claim with AAR and dropped it as a party. (DE 1, 18).

SGR/13533233.4

> AAR warrants that the <u>services</u>[8] performed by AAR hereunder will be free from defects in workmanship and that it **shall have good title to all goods, parts, and components sold** or exchanged **by AAR for the Services** pursuant to this Agreement, free and clear of any and all claims, liens, mortgages or other encumbrances of any kind.

(<u>Id</u>.).  (emphasis added).  Section 6.7 conspicuously (in bold, enlarged print with all capital letters) expressly disclaims all other warranties or agreements, including any implied warranties. (MC R. 56.1 ¶ 14).  Additionally, § 6.8 limits AAR's liability to the price paid by HAL for the services, and § 6.10 conspicuously provides that AAR is <u>not</u> liable for consequential damages or lost profits because of any defect in its performance under the Agreement.  (<u>Id</u>.).

HAL did not directly contract with Mankiewicz to purchase the paint products for use in completing the task of repainting its 717s and 767s.  (MC R. 56.1 ¶ 15).  Instead, _**AAR**_ purchased and used the specified Mankiewicz's CF paint system on HAL's 717s, as set forth by HAL in its engineering documents.  (<u>Id</u>.).  HAL did not discuss with AAR why HAL chose Mankiewicz's paint system.  (<u>Id</u>.).

AAR did not communicate with Mankiewicz regarding the selection of the paint products, but simply submitted a series of Purchase Orders ("POs") to Mankiewicz to purchase the CF paint products specified by HAL.  (MC R. 56.1 ¶ 16).  Mankiewicz responded by tendering corresponding Order Confirmations ("OCs"), followed by delivery notes and invoices, setting forth the quantities, prices, and terms of the products purchased by AAR.  (<u>Id</u>.).  Certain of AAR's POs referenced HAL or specific HAL 717 tail numbers; however, these incidental references were included so that AAR would know to bill the invoice to HAL.  (<u>Id</u>.).  Neither AAR's POs nor the OCs express an intent to primarily benefit any third party (in fact, HAL is not mentioned in Mankiewicz's OCs or delivery notes, nor is HAL mentioned in the "terms and conditions" of the POs).  (MC R. 56.1 ¶ 17).  Rather, Mankiewicz's Managing Director Dietz has stated that he intended Mankiewicz to be the primary beneficiary of the agreements.  (<u>Id</u>.).

In accordance with the Agreement, AAR (or a subcontractor) stripped, pretreated and repainted eleven (11) of HAL's 717s on a one-by-one rolling basis during 2010 – 2011.  (MC R. 56.1 ¶ 18).  AAR also inspected and verified the stripping and repainting conformed to HAL's EO.  (<u>Id</u>.).  During 2010-2011, HAL also repainted its 767s using the exact same Mankiewicz CF primer system as used on its 717s (in fact, some of the paint batches overlapped).  (<u>Id</u>.).

---

[8] Services" under the Agreement includes AAR's obligation to purchase and provide all "parts, materials, kits and components required to accomplish the work package."  (MC R. 56.1 ¶ 13).

However, HAL's 767s were repainted by a different MRO, Delta Tech Ops. (Id.). In 2012 and 2013, HAL began discovering what it characterizes as accelerated filiform corrosion on the 717s repainted by AAR. HAL has not experienced accelerated corrosion on its 767s repainted by Delta Tech Ops, and HAL makes no claim against Mankiewicz relating to its 767s. (Id.).

In March 2013, after being advised of HAL's corrosion issue, Boeing personnel came to Hawaii and conducted a visual inspection of certain of the 717s and took three paint chip samples for testing from one section of one 717 (Tail No. N491).[9] (MC R. 56.1 ¶ 19). Boeing's engineers did not perform a causal analysis for the corrosion, but instead, only tested the paint chips for the presence of chromate. (Id.). Not surprisingly, the results of the test confirmed that Mankiewicz's CF paint products did not contain chromate. (Id.). Based on this finding, Boeing's engineers "concluded" that HAL's use of a non-OEM approved primer was one of the causes of the filiform corrosion to the 717 fuselages, referring to it as the "root cause." (Id.).[10]

On June 30, 2014, HAL filed its Amended Complaint alleging claims against Mankiewicz for: breach of contract (Count I), breach of third-party beneficiary contract (Count II), breach of implied warranty of merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count IV), breach of [express] warranty (Count V), breach of the duty of good faith and fair dealing (Count VI), misrepresentation (Count VII), unjust enrichment (Count VIII), violation of the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA") (Count IX); and violation of the Magnuson-Moss Warranty Act ("MMWA") (Count X).

Each of HAL's claims arise from alleged statements, referred to as "misrepresentations" or verbal "warranties," made by Mankiewicz to HAL that its paint products were OEM approved, complied with all applicable specifications, including FAA requirements, and would meet HAL's specific operational needs, including being suitable for the particular environmental

---

[9] N491 is **not** one of the 717's at issue in this case, but was repainted by a different MRO, Leading Edge, in California, pursuant to a separate contract. (MC R. 56.1 ¶ 19).

[10] Boeing's engineers attempted to support its conclusion by stating that the "same paint system" had failed a 2008 Boeing corrosion test. (MC R. 56.1 ¶ 20). However, at deposition, Boeing's corporate representative, Mira Kim, acknowledged that the 2008 Boeing test was of *an entirely different coating system*, consisting of Mankiewicz's CF paint products over a *chromate-free* pretreatment known as AC131 Solgel or Boegel ("Solgel"), as opposed to the Alodine pretreatment specified in Mankiewicz's Application Guide, which is chromated. (Id.). Additionally, Ms. Kim admitted that the 2008 test tested the paint system to BMS 10-72, not the DMS 2104 standard applicable to the 717s. (Id.).

5

conditions in which HAL's 717s routinely operate.[11]  (DE 27, ¶¶ 9, 17, 20, 23, 28, 40, 45, 52, 55, 59, 62).  The Amended Complaint also alleges that Mankiewicz withheld from HAL the 2008 Boeing BMS 10-72 test results, and that in 2010, Mankiewicz gave "further assurances" of the suitability of its paint products for HAL's needs.[12]  (DE 27, ¶¶ 10, 17); .

## MEMORANDUM OF LAW

### I.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted if the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact, and thereby requires judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, giving the benefit of all inferences to the non-movant.  Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990).  However, the non-moving party must provide more than a mere scintilla of evidence to survive summary judgment.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc).  The burden on the moving party to show the absence of a genuine issue of material fact may be discharged by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

### II.   HAL'S STATUTORY CLAIMS (COUNTS IX-X) FAIL AS A MATTER OF LAW

#### A.   HAL is not entitled to make a claim under the MMWA

Only "consumers" who have purchased a "consumer product" may recover for claims under the MMWA.  Section 2310(d)(1) of the MMWA provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the MMWA] . . . may bring suit for damages and other legal and equitable relief."  15 U.S.C. §  2310(d)(1).  A "consumer" is defined under the MMWA as

> **"a buyer . . . of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty . . . applicable to the product, and any other person who is entitled by the terms of such warranty . . . or under applicable State**

---

[11] HAL's 717s primarily service inter-island routes in the Hawaiian Islands.  (Kup Dep. 269:23-270:8).

[12] The "further assurances" relates to a 2010 email from Jeanne Warren to HAL, in which Ms. Warren, a Mankiewicz sales representative, is responding to a question regarding the life expectancy of the paint coating, not its corrosion resistance.  (Warren Dep. Ex. HAL 30).

SGR/13533233.4

> law to enforce against the warrantor . . . the obligations of the warranty…"

15 U.S.C. § 2301(3).

HAL, a commercial airliner and common carrier operating pursuant to a FAA certification, did not purchase a **consumer product** (directly or through AAR) from Mankiewicz. A "**consumer product**" means "any tangible personal property which is distributed in commerce ***and which is normally used for personal, family, or household purposes*** . . . ." 15 U.S.C. § 2301(1) (emphasis added); see e.g., Kemp v. Pfizer, Inc., 835 F.Supp. 1015, 1024 (E.D. Mich. 1993) (a prosthetic heart valve is not a consumer product, as they are not sold to unsuspecting consumers relying on the warranties of unscrupulous retailers). Under this definition, courts have held that paint products sold for commercial applications are not "consumer products." See e.g., In re Ford Motor Co. Vehicle Paint Litig., 1996 WL 426548 at *35 (E.D. La., July 30, 1996) (paint purchased by Ford for commercial application at its manufacturing facilities was not a consumer product and could not form the basis for a claim under the MMWA); see also Gentek Building Prods., Inc. v. Sherwin-Williams Co., 491 F.3d 320 (6th Cir. 2007).

In the instant case, HAL's MMWA claim (Count X) fails because HAL is not a "consumer" under the MMWA, as the paint products that HAL specified by EO for use on its 717s, and which Mankiewicz sold to AAR, are not "consumer products." Specifically, the undisputed facts demonstrate that Mankiewicz only markets and sells its aviation paint products to MROs, airlines, and related commercial entities for commercial application. Mankiewicz's CF paint products at issue in this case are not "normally used for personal, family, or household purposes." Thus, Mankiewicz is entitled to summary judgment on Count X, as a matter of law.

B. **HAL's FDUTPA Claim Fails Because the Alleged Deceptive Conduct Occurred Outside of Florida**

In Count IX, HAL seeks to attempts to assert a claim against Mankiewicz under FDUTPA, § 501.201, et seq., Fla. Stat. Section 501.204(1) states: "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

The gravamen of HAL's FDUTPA claim is Mankiewicz's alleged misrepresentations (and/or failure to disclose information on its products) during Mankiewicz's marketing presentation to HAL in Hawaii in August 2009, after which meeting HAL specified

7

Mankiewicz's CF paint system as the preferred paint for its 717s in its ESD. It is undisputed that the Amended Complaint does not allege, and the record evidence does not suggest, that Mankiewicz engaged in any deceptive conduct within the State of Florida. For that reason, the claim fails.[13]

As this Court has held a number of times, FDUTPA applies to protect non-Florida consumers only when the alleged wrongful conduct occurred **_within_** the state of Florida. For example, in her analysis of whether a non-Florida party could proceed with a FDUTPA claim based upon deceptive practices outside the boundaries of the State of Florida, U.S. District Judge Seitz's conclusion was unequivocal that the non-Florida party could not do so in <u>Carnival Corp. v. Rolls-Royce PLC</u>, 2009 WL 3861450, at *6 (S.D. Fla. Nov. 17, 2009). In <u>Carnival Corp.</u>, Judge Seitz stated:

> FDUTPA applies only to action that occurred within the state of Florida. Consequently, Plaintiff's claim that Defendants violated FDUTPA must be based entirely on actions that occurred in Florida.

<u>Id.</u> (internal citations omitted). Judge Seitz reached the same conclusion of law in <u>Five for Entertainment v. Rodriguez</u>, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012); <u>see also</u> <u>Millennium Comm. & Fulfillment, Inc. v. Office of Attorney General</u>, 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000).

The same principal of law also has been enunciated by three other Judges of this Court, U.S. District Judge Cohn in <u>Karhu v. Vital Pharmas., Inc.</u>, 2013 WL 4047016, at *10 (S.D. Fla. Aug. 9, 2013); U.S. District Judge Middlebrooks in <u>Beaver v. Inkmart, LLC</u>, 2012 WL 4005970, at *3 (S.D. Fla. Sept. 12, 2012) and U.S. Magistrate Judge Brown <u>In re NationsRent Rental Fee Litig.</u>, 2009 WL 636188 at *5 (S.D. Fla. Feb. 24, 2009). Accordingly, HAL's FDUTPA claim fails, as a matter of law.

## III.    HAL's CONTRACTUAL AND WARRANTY BASED CLAIMS FAIL

HAL's contractual and warranty-based claims (Counts I-VI) fail because: (1) no direct contract existed between Mankiewicz and HAL; (2) HAL waived its rights to sue Mankiewicz for claims arising out of defects in AAR's performance of the Agreement; (3) HAL was not an

---

[13] HAL has also contended that Mankiewicz should have disclosed information relating to a communication with a Boeing engineer in California sometime after a number of the 717s had been repainted by AAR, and that its engineers or other personnel in Hawaii were misled by a subsequent email communication from a Mankiewicz sales representative (Jeanne Warren) in California in 2010. Obviously, neither of these events involved conduct in Florida.

SGR/13533233.4

intended third party beneficiary of AAR's purchases of Mankiewicz's paint products; (4) no express warranty or implied warranty of fitness for a particular purpose existed between AAR and Mankiewicz; and (5) there is no evidence of a breach of the purchase documents between Mankiewicz and AAR, or the implied warranty of merchantability.

### A.      HAL's Direct Contract and Warranty Claims (Counts I, and III-VI) Fail

Counts I and VI of the Amended Complaint asserts a claim for breach of contract against Mankiewicz and breach of the implied covenant of good faith and fair dealing.   (DE 27). Similarly, Counts III-V assert claims for breach of express and implied warranties.  The warranty claims (Counts III-V) are based upon alleged "warranties" made by Mankiewicz directly to HAL (Id., ¶¶ 40, 45).   Thus, as pled, these claims (Counts I, and III-VI) are direct claims against Mankiewicz, and not based upon HAL's alleged status as a third-party beneficiary of any alleged agreements or warranties between Mankiewicz to AAR (such as is alleged in Count II)[14].

It is black letter law that the elements of a claim for breach of an express contract are:  (1) the existence of a contract between the parties; (2) breach; and (3) damages caused by the breach.  A claim for breach of the implied covenant of good faith and fair dealing also depends upon a showing that an *express* term of a contract has been breached.  Ins. Concepts and Design v. Healthplan Servs., Inc., 785 So.2d 1232, 1234-35 (Fla. 4th DCA 2001).  Additionally, express and implied warranty-based claims require privity of contract between the parties.  See Kaiser v. Depuy Spine, Inc., 944 F.Supp.2d 1187, 1193 (M.D. Fla. 2013); Weiss v Johansen, 898 So.2d 1009, 1012, (Fla. 4th DCA 2005); David v. Am. Suzuki Motor Corp., 29 F.Supp.2d 1309, 1323 (S.D. Fla. 2009).

In the instant case, it is undisputed that no privity of contract exists between HAL and Mankiewicz.  Rather, HAL and AAR were in privity of contract by virtue of AAR's Agreement, as AAR directly purchased Mankiewicz's paint products through the exchange of AAR's POs and Mankiewicz's OCs.  Lack of privity of contract between Mankiewicz and HAL is fatal to HAL's claims for breach of contract, and breach of express and implied warranties. Additionally, HAL's claim for breach of the implied covenant of good faith and fair dealing (Count VI) is dependent upon the showing of a breach of an express provision of an agreement,

---

[14] Notwithstanding the allegations of the Amended Complaint, to the extent HAL's claims in Counts III-VI are based on its alleged status as a third-party beneficiary of AAR's purchases of Mankiewicz's paint products, the claims still fail, as a matter of law, as set forth in Section III. C., *infra*.

and as no such express agreement exists, this claim also fails.  Thus, Mankiewicz is entitled to summary judgment on Counts I, and III-IV as a matter of law.

       **B.**      **HAL Third-Party Beneficiary Claims Are Barred by the Terms of Its Contract with AAR**

As clearly demonstrated below (see § 3.C., *infra*), HAL is not an intended third-party beneficiary to the contract documents by which AAR purchased paint from Mankiewicz. However, Mankiewicz respectfully submits that the Court does not need to reach this issue, and can enter summary judgment against HAL on its third-party beneficiary claim in Count II (and to the extent Counts III-VI are based on HAL's alleged status as a third-party beneficiary of AAR's purchases of Mankiewicz's paint products, on these claims as well), because of the specific provisions in the Agreement between AAR, as general contractor to refurbish HAL's 717s, and HAL, as the aircraft owner.  Simply stated, HAL entered into a general contract to perform 439 different tasks (including providing the necessary labor and procuring the necessary materials) to completely refurbish 11 of HAL's 717s for a fixed price per aircraft.[15]  In the Agreement to furnish a finished product, AAR and HAL agreed to limit AAR's liability under the Agreement to the price paid by HAL for the services (including parts), and conspicuously waived HAL's right to recover consequential damages or lost profits because of any defect in its performance under the Agreement.  Moreover, the Agreement conspicuously waived any express or implied warranties relating to AAR's performance, including the work done and materials provided by subcontractors and materialmen working for AAR (which necessarily includes AAR's purchase and application of Mankiewicz's paint products), except for AAR's express limited warranty that the finished product (aircraft) would be free and clear from defects (***including defects in the parts***)**,** for a period of ***6 months***.  Such limitations are valid and enforceable.  *See* Xerox Corp. v. Graphic Mgmt. Servs. Inc., 959 F.Supp.2d 311, 320 (W.D.N.Y. 2013) (parties to a contract may limit their respective remedies for breach of the contract).[16]

Based on the foregoing, HAL is barred from "leapfrogging" out of the Agreement with AAR and suing Mankiewicz, a materialman to AAR, as a third-party beneficiary of any agreements or express or implied warranties between Mankiewicz and AAR.  Instead, HAL's exclusive contract and warranty-based remedies are the remedies expressly set forth in the

---

[15] HAL paid a fixed price under the Agreement of $513,960.00 per aircraft.

[16] By its terms, the Agreement is governed by New York law.  (MC R. 56.1 ¶ 12).  Nevertheless, Florida and New York law are consistent on this legal principle.

SGR/13533233.4

Agreement.  In this regard, HAL has pursued its available contractual remedies against AAR in this lawsuit, and settled its claims.[17]  HAL should not be permitted to "double-dip" on its recovery by suing Mankiewicz for claims and damages that HAL expressly waived and disclaimed in its general contract with AAR.  See Dravo Corp. v. Robert B Kerris, Inc., 655 F.2d 503, 510 (3rd Cir. 1981).  Notably, this conclusion comports with the parties' intended and expected contractual rights.  See In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 21 F.Supp.2d 593 (E.D.La. 1998) (denying homeowner-plaintiffs' claims as an intended third-party beneficiary of a contract between general contractor and subcontractors/materialmen, and concluding that, although the result was "harsh" in that it foreclosed all remedies to the plaintiffs, the plaintiffs were bound by their agreements and could not recover against the supplier).  Thus, Mankiewicz is entitled to summary judgment on HAL's third-party beneficiary based claim(s) in Count II (and Counts III-VI to the extent they are based on a third-party beneficiary theory of liability).

## C.   HAL was not an Intended Third-Party Beneficiary of AAR's Purchases of Mankiewicz's Paint Products.

### i.   Third-Party Beneficiary Legal Standard

Under Florida law, a party is an intended third-party beneficiary only if the parties to the contract *clearly express*, or the contract itself *expresses*, an intent to primarily and directly benefit the third-party.[18]  Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So.2d 1028, 1031 (Fla. 4th DCA 1994) (emphasis added).  "If the parties had no such purpose in mind, any benefit from the contract reaped by the third-party is merely 'incidental,' and any third-party has no legally enforceable right in the subject matter of the contract."  Bochese v. Town of Ponce Inlet, 405 F.3d 964, 981-82 (11th Cir. 2005).

The contracting parties' intent to benefit the third party must be *mutual*, *specific* and *clearly expressed* in order to endow a third-party beneficiary with a legally enforceable right.  Id. at 982 (emphasis added); Biscayne Inv. Grp. v. Guar. Mgmt. Servs., Inc., 903 So. 2d 251, 254-55

---

[17] Notably, HAL did not assert a claim against AAR for breach of its 6 month warranty in this lawsuit, as it is *undisputed* that the 717s did not begin to experience any alleged accelerated corrosion until approximately 2 years after AAR delivered the refurbished 717s to HAL.

[18] Whether a non-party to a contract has a right to maintain an action on a contract as a third-party beneficiary is a matter of state law.  Rebman v. Follett Higher Educ. Grp., Inc., 575 F.Supp.2d 1272, 1276 (M.D. Fla. 2008).  Mankiewicz agrees with HAL's position in its Motion for Partial Summary Judgment (DE 171 @ 8, n.6) that Florida law governs this issue.

SGR/13533233.4

(Fla. 3d DCA 2006) (plaintiffs' arguments that they caused a homeowners' association to enter into a management agreement and participated in the hiring of the management company are of no consequence where the management agreement is silent and shows no intent to confer third-party beneficiary status); Rebman, 575 F.Supp.2d at 1277 ("it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party.").

Importantly in this case, the contracting parties' knowledge that the contract (and products used to perform the contract) will ultimately benefit an identifiable third-party is _insufficient_ to transform an "identifiable" third-party into an "intended" third-party beneficiary. See e.g., Publix Super Markets, Inc. v. Cheesbro Roofing, Inc., 502 So.2d 484, 488 (Fla. 5th DCA 1987) (superseded by statute on other grounds) (holding that a property owner is an incidental third-party beneficiary of a contract between a general contractor and subcontractor because neither the contract nor anything else in the record clearly expressed an intent to primarily benefit the owner); Rebman, 575 F.Supp.2d at 1277.   Federal courts in other jurisdictions have also concluded that, even though a third-party is referenced in a purchase order or agreement, the third-party is merely an incidental beneficiary absent express evidence that the contracting parties intended to bestow a direct benefit on the third-party.  See e.g., Tull Bros., Inc. v. Peerless Prods., Inc., 953F.Supp. 2d 1245, 1259 (S.D. Ala. 2013); Dravo Corp., 655 F.2d at 510.  Indeed, an alleged third-party beneficiary has the burden to present evidence showing the clear intent of the parties to the contract to directly and primarily benefit the third-party, and cannot rely on mere opinion or belief to oppose entry of summary judgment. Rebman, 575 F.Supp.2d at 1277 (emphasis added).

### ii.    Application to HAL's Claims

HAL's third-party beneficiary-related claims (Count II, and possibly Counts III-VI), all require an initial finding that HAL was an _**intended**_ third-party beneficiary of AAR's purchases of Mankiewicz's paint products.  As such, each of these claims fails because neither the purchase documents (AAR's POs and Mankiewicz's OCs), nor the dealings between Mankiewicz and AAR, express a _clear intent by both parties_ to primarily and directly benefit HAL.

First, AAR's and Mankiewicz's PO's and OCs do not express an intent by Mankiewicz or AAR to directly and primarily benefit HAL.  In fact, Mankiewicz's OCs demonstrate an intent that it and AAR are the only intended beneficiaries of the purchase documents, as its terms and conditions do not reference HAL, prohibit assignment of the agreement without written consent,

12

and contain a merger cause.[19]  Similarly, AAR's POs do not express a _clear_ and _specific_ intent to bestow a direct or primary benefit on HAL.  HAL is not mentioned in AAR's terms and conditions, and is only incidentally referenced in the "PO Notes" line of _some_ of the POs.  The occasional references to HAL in the "notes" lines of certain of the POs (without further comment), are certainly not an expression of _specific and clear intent_ to _primarily_ benefit HAL. See, Peters v. Keyes Co., 2010 WL 1645095, at *3-4(S.D. Fla. April 21, 2010) (mention of broker's rights in purchase contact insufficient to find broker was an intended third-party beneficiary); Tull Bros., Inc., 953 F.Supp.2d at 1259-60.  This conclusion is further compelled by Brian Loomer's, AAR's corporate representative, testimony that the _references to HAL were only made so that AAR would know to bill HAL for the paint products purchased_.  (MC R. 56.1 ¶ 14).  Thus, the POs and OCs do not express specific intent to primarily benefit HAL.

Second, HAL cannot demonstrate that AAR or Mankiewicz (much less both) expressed a clear intention to primarily benefit HAL at the time the POs and OCs were exchanged.  The record is devoid of evidence that the intent of AAR in submitting the POs was motivated by anything other than AAR's obligation to perform under its Agreement with HAL, and Mankiewicz sold its paint products to AAR to primarily and directly benefit itself, not HAL. (MC R. 56.1 ¶15).  The fact that both parties knew the paint would ultimately be used on HAL's 717s (along with countless other parts and materials purchased by AAR) is insufficient to transform HAL into an intended beneficiary of these purchases.  Cheesbro, 502 So.2d at 488. Similar to Cheesbro, HAL is nothing more than an incidental beneficiary of the agreements between AAR (MRO purchaser) and Mankiewicz (supplier).  Id. at 488.

Finally, HAL's assertion that certain acts extraneous to the written POs and OCs, i.e., HALs coordination of telephone calls with AAR and Mankiewicz, or instruction provided by Mankiewicz's representatives to AAR on how to properly mix the paint, show that it was an intended third-party beneficiary, is unavailing.  HAL's argument in this regard is mere speculation.  This is not record evidence, and is insufficient to show a specific intent to benefit HAL necessary to avoid summary judgment.  See Rebman, 575 F.Supp.2d at 1278.  AAR and Mankiewicz engaged in these activities to further their own self-interests - Mankiewicz to profit

---

[19] The merger clause provides that "[t]his Agreement represents the entire agreement between the parties and is a final, complete, and exclusive statement of the terms thereof.  The parties have not made or relied upon any representations, understandings, or other agreements not specifically set forth herein."  (MC R. 56.1 ¶ 16; DE 172, ¶ 40).

from selling paint products, and AAR to profit from performing its six million dollar Agreement with HAL.  Based on the foregoing, Mankiewicz is entitled to summary judgment on Count(s) II (and III through VI to the extent such claims are based on HAL's status as an intended third-party beneficiary), of the Amended Complaint.

>    **D.    Mankiewicz Did Not Breach Its Agreements with AAR, and No Express Warranty or Implied Warranty of Fitness for a Particular Purpose Exist**

Assuming, *arguendo*, sufficient evidence exists to justify submitting the question of whether HAL was an intended third-party beneficiary to a jury, Mankiewicz is still entitled to summary judgment on Count(s) II (and III through VI to the extent such claims are based on HAL's status as an intended third-party beneficiary), because Mankiewicz did not breach its agreements or any warranty between it and AAR.

>    **i.    The Terms of the AAR Purchases**

AAR and Mankiewicz's "agreements" consist of the POs and OCs they exchanged with their respective terms and conditions attached.  Courts employ U.C.C. § 2-207 in this situation to determine whether a contract was formed and if so, the terms of such contract.  See Option Wireless, Ltd. v. OpenPeak, Inc., 2012 WL 6045936 at *4 (S.D. Fla., Dec. 5, 2012).

Mankiewicz incorporates its § 2-207 analysis of the POs and OCs in its Memorandum in Opposition to HAL's Motion for Partial Summary Judgment (DE 185).  As set forth therein, AAR's POs and HAL's OCs formed a series of agreements under U.C.C. § 2-207(1).  Under this analysis, AAR's POs and Mankiewicz's OCs are consistent on price, quantity, and type of paint products ordered.  As such, those terms constitute the operative terms of the agreements.  However, the parties' warranty provisions contained in the respective "terms and conditions" of their POs and OCs do not become part of the agreements under § 2-207(2) because they differ.  Option Wireless, 2012 WL 6045936 at *8.  Therefore, the warranty provisions entered into between AAR and Mankiewicz contain the U.C.C. "gap-filler" warranty of merchantability provided in § 2-316, but no other express or implied warranties.

>    **ii.    Mankiewicz Has Not Breached the Express Terms of Any Purchase Documents Between Mankiewicz and AAR.**

Separate from HAL's breach of warranty claims, Count II of the Amended Complaint alleges that Mankiewicz breached its agreements with AAR by "supplying paint products that did not comply with the applicable requirements and specifications, including FAA

requirements,[20] were not OEM approved, and were not able to meet HAL's specific operational needs." (DE 27, ¶ 28).

It is axiomatic that to prevail on a claim for breach of contract, a plaintiff must, in fact, demonstrate the existence and breach of a specific provision of the contract. *See* <u>Kaiser</u>, 944 F. Supp. 2d at 1193. Here, it is indisputable that operative terms of the agreements between Mankiewicz and AAR (which consist of the portions of AAR's POs and Mankiewicz's OCs that do not conflict) ***do not*** provide that the paint sold would comply with any "applicable requirements and specifications, including FAA requirements," that it would be Boeing OEM approved, or that it would meet HAL's specific operational needs. Rather, the agreements simply provide that Mankiewicz would sell AAR the paint products AAR specifically ordered at the price and quantities ordered. Moreover, HAL's allegation that the "agreements" provided that the paint would be OEM approved is contradicted by HAL's admission that it specified Mankiewicz's paint products for use on its 717s knowing that it was not Boeing OEM approved. Thus, Count II fails because the alleged contractual "provisions" HAL claims Mankiewicz breached do not exist, and are contrary to both parties' understanding and HAL's admissions.

Furthermore, Count II (and Count VI to the extent it is a third-party beneficiary claim) fails because there is no evidence that Mankiewicz breached any existing term of its agreements with AAR. Specifically, there is no record evidence that Mankiewicz failed to deliver the paint products ordered by AAR in the quantities specified, or breached any other operative term of the agreements. Accordingly, summary judgment should be entered on Count II (and Count VI) of the Amended Complaint, as a matter of law.

### iii.    HAL's Claim for Breach of Express Warranty (Count V) Fails.

Assuming, *arguendo*, that HAL's claim in Count V is based on its alleged status as a third-party beneficiary (which is contrary to the express allegations in the Amended Complaint), HAL's claim still fails because no express warranty existed between Mankiewicz and AAR.[21] As set forth above, AAR's and Mankiewicz's conflicting express warranties cancelled each other

---

[20] There are numerous FAA requirements with which HAL is required to comply as a commercial airline. Nowhere in the Amended Complaint or otherwise has HAL ever identified which requirement it purports to refer to in this allegation, much less how it would relate to Mankiewicz.

[21] To the extent HAL's claim for breach of express warranty is based on an alleged direct warranty between Mankiewicz and HAL, HAL's claim fails because no direct contract exists, as set forth in Section III. A., *supra*.

SGR/13533233.4

out under § 2-207(2).  Therefore, the only express warranty that could exist would have to be based on U.C.C. § 2-313.  That statute provides that express warranties are created by "any affirmation of fact or promise made by the seller **to the buyer** which relates to the goods and becomes part of the basis of the bargain," or "any description of the goods which is made part of the basis of the bargain."  Fla. Stat. § 672.313 (emphasis added).  "The requirement that a statement be part of the basis of the bargain 'is essentially a reliance requirement and is inextricably intertwined with the initial determination as to whether given language may constitute an express warranty since affirmations, promises and descriptions tend to become part of the basis of the bargain.'"  Royal Typewriter Co. v. Xerographic Supplies. Corp., 719 F.2d 1092, 1101 (11th Cir. 1983) (citing Royal Bus. Machs., Inc. v. Lorraine Corp., 633 F.2d 34, 44, n. 7 (7th Cir. 1980)).

Here, there is no evidence that Mankiewicz made any express warranty **_to AAR_** as to the suitability of its paint products for HAL's 717s or otherwise.  In fact, AAR testified that it did not communicate with Mankiewicz regarding paint selection.  (MC R. 56.1 ¶ 14).  However, even if Mankiewicz had made any representation to AAR regarding the selection of the paint products (which did not happen), AAR did not rely on any such representation.  Instead, the record is undisputed that **_HAL_** selected the paint products, and AAR simply followed the specifications in HAL's engineering documents in purchasing Mankiewicz's paint products.  Finally, HAL's allegations that Mankiewicz made statements **_to HAL_** regarding the suitability of Mankiewicz's paint products is unavailing because, assuming, _arguendo,_ such statements were made to HAL, they fail to constitute an express warranty **_to AAR_**.  HAL receives no greater rights than AAR had against Mankiewicz under a third-party beneficiary theory of liability.  See Seaboard Sur. Co. v. Garrison, Webb, & Stanaland, P.A., 823 F.2d 434 (11th Cir. 1987) (third-party beneficiary's right can rise no higher than that of the promisee).  Thus, Mankiewicz is entitled to summary judgment on Count V, as a matter of law.

    **iv.  HAL's Claim for Breach of Implied Warranty of Fitness for a Particular Purpose Fails.**

Florida law requires privity of contract to sustain a breach of implied warranty claim.  See David v. Am. Suzuki Motor Corp., 29 F.Supp.2d 1309, 1323 (S.D. Fla. 2009).  As such, the only possible basis for HAL to sue Mankiewicz for breach of an implied warranty is as a third-party beneficiary of any implied warranty that exists between AAR and Mankiewicz.  Florida Statute § 672.315 provides that "[w]here the seller at the time of contracting has reason to know

16

any particular purpose for which the goods are required **and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods**, there is . . . an implied warranty that the goods shall be fit for such purpose." (emphasis added).  Courts interpreting this provision have consistently rejected claims for breach of the implied warranty of fitness for a particular purpose when the **buyer [AAR] did not rely on the seller** in determining what product to purchase.  See e.g., Czarnecki v. Roller, 726 F.Supp. 832, 844-45 (S.D. Fla. 1989) (buyer based his decision to purchase yacht on his own inspections, sea trials, and acceptable marine surveys); Two Rivers Co. v. Curtiss Breeding Serv., 624 F.2d 1242, 1252 (5th Cir. 1980) (plaintiff's claim for breach of implied warranty of fitness for particular purpose failed because plaintiff relied on third-party, not seller, to select product to be purchased).

As set forth above, **_AAR_** did not communicate with or rely on Mankiewicz to select the paint products to be used on HAL's 717s.  AAR simply followed HAL's engineering department's paint product specifications, and placed orders with Mankiewicz for such products.  HAL's claim for breach of the implied warranty of fitness for a particular purpose fails because no such warranty existed between Mankiewicz and AAR.  Thus, Mankiewicz is entitled to summary judgment on Count IV of the Amended Complaint.

### v.   Mankiewicz Did Not Breach the Implied Warranty of Merchantability

Again, HAL's only basis to sue for breach of an implied warranty would be as a third-party beneficiary of the purchase documents between AAR and Mankiewicz.  Florida Statutes § 672.316(1), provides that a warranty that goods sold shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  "Chapter 672.314(2) defines the term 'merchantability' and states that it includes an implied warranty that the goods are fit to use for their normal services or acceptable in the trade and are of fair average quality."  MAAS Bros. Inc. v. Vincent, 10 B.R. 549, 552 (M.D. Fla. Bankr. 1981); see also Royal Typewriter, 719 F.2d at 1099 (to be merchantable, goods must have passed without objection in the trade under the contract description, be of fair average quality, and be fit for the ordinary purposes for which such goods are used).

Here, there is no record evidence that Mankiewicz's CF primer system was not fit to use for its normal purpose, would not have passed without objection in the trade at the time it was sold, was rejected by AAR, or was not fit for the ordinary purposes for which it is used – namely, the painting of aircraft exteriors.  Instead, the record evidence shows that Mankiewicz's primer

17

system is Airbus OEM approved and is applied to HAL's Airbus A330s and HAL's 767s and serves without any issues. HAL's allegations (and all of the evidence in this case) do not address the issue of merchantability, but instead, are directed to whether the paint products were fit for HAL's particular purpose - use on HAL's 717s in Hawaii. HAL's lack of record evidence on merchantability is fatal to its claim. *See* Celotex, 477 U.S. at 325. Therefore, Mankiewicz is entitled to summary judgment on Count III as a matter of law.

## IV.   HAL's MISREPRESENTATION CLAIM FAILS

HAL does not allege whether its misrepresentation claim (Count VII) is based on intentional or negligent acts. However, because HAL does not allege the purported misrepresentations were intentional or fraudulent, as required by Rule 9(b), Fed. R. Civ. P., the claim appears to be based in negligence, and Mankiewicz will analyze the claim under this standard. The elements of a claim for misrepresentation are: (1) false information supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered a loss; and (3) the recipient justifiably relied upon the misrepresentation.[22] Blair v. Ing, 21 P.3d 452, 474 (Haw. 2001); see also Honolulu Disposal Serv., Inc. v. Am. Ben. Plan Adm'rs, Inc., 433 F.Supp.2d 1181, 1192-94 (D. Haw. 2006) (holding that *justifiable* reliance is an element of a misrepresentation claim). Hawaii courts have held that a plaintiff's reliance on a misrepresentation is not justified if the plaintiff has access to information that would have led to the discovery of the true facts. Id. at 1192-94. Whether a plaintiff's reliance was justifiable may be decided on summary judgment where the facts support only one conclusion. Id.

In the instant case, HAL's misrepresentation claim (Count VII) fails because, even viewing the evidence in a light most favorable to HAL, one cannot conclude that HAL justifiably relied on any alleged misrepresentations or omissions. HAL asserts that Mankiewicz misrepresented that its paint products were "OEM approved" and complied with all applicable specifications, continued its misrepresentation through "further assurances" made after the repainting had begun, and failed to provide HAL the results of a 2008 Boeing corrosion test.

---

[22] Because HAL's misrepresentation claim is based on alleged statements and omissions that occurred during a presentation to HAL in Hawaii and in subsequent communications from Mankiewicz to HAL in Hawaii, it appears that Hawaii has the most significant relationship to this claim.

First, assuming, *arguendo*, that Mankiewicz represented that its products were Boeing approved and complied with all "applicable specifications," HAL's reliance was not justifiable because HAL *admits* that it knew Mankiewicz's paint products were not Boeing OEM approved, and that they had not been tested to the DMS 2104 standard.  In fact, Dan Smith of HAL testified that Mankiewicz never made a representation that its CF primer was DMS 2104 approved.  (Smith Dep. 210:24-211:6).

Second, HAL did not rely on any "further assurances" made in a 2010 email from Jeanne Warren of Mankiewicz to HAL's personnel in selecting Mankiewicz's paint products because, at that time, HAL had already decided to specify Mankiewicz's paint products for use on its 717s, approved the ESD, and AAR had already begun repainting the aircraft.  Furthermore, Dan Smith, HAL's engineer and corporate representative, testified that HAL relies on data, not statements from sales people, when deciding whether to approve a product.  Thus, any "further assurances" from a Mankiewicz salesperson would not have been relied upon by HAL.

Additionally, it is clear that no "misrepresentations" were made in the 2010 email. Rather, in the email, Ms. Warren responded to a question from HAL regarding the life expectancy of the paint products (not Boeing approvals), and the email simply states that Mankiewicz's paint products are developed to meet Boeing and Airbus specifications (but does not mention Douglas legacy aircraft specifications such as DMS 2104).  HAL already knew that the paint products were not Boeing approved.  Moreover, HAL had a substantial relationship with Boeing/Douglas yet inexplicably never communicated with Boeing/Douglas regarding this new CF primer system.  As a federally certified operator of a commercial airline, HAL cannot show justifiable reliance on such "further assurances," particularly when it has a staff of professional engineers to guide its actions.

Third, the 2008 BMS 10-72 test is immaterial.  As fully explained in Mankiewicz's *Daubert* motion, the Boeing test used a chromate-free pretreatment, whereas Mankiewicz specified Alodine, a chromated pretreatment.  Additionally, the Boeing test was done to an inapplicable Boeing specification, not DMS 2104.  Accordingly, the test results of an entirely chromate-free paint "stack-up" to an inapplicable specification would have been, at best, misleading and unreliable.  Thus, Mankiewicz is entitled to summary judgment on Count VII.

19

V.      **HAL's UNJUST ENRICHMENT CLAIM FAILS**

The elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof. Jackson-Jester v. Aziz, 48 So.3d 88, 90 (Fla. 2d DCA 2010). "When a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails." Am. Safety Ins. Serv., Inc. v. Griggs, 959 So.2d 322, 331-32 (Fla. 5th DCA 2007).

In the instant case, HAL's claim for unjust enrichment fails because HAL did not confer a direct benefit on Mankiewicz. Instead, AAR conferred a benefit on Mankiewicz by purchasing its paint products. Thus, HAL cannot satisfy the first element of a claim for unjust enrichment. Moreover, HAL's claim fails because it cannot show that Mankiewicz's "acceptance" of the benefit received from AAR would be unjust. Specifically, Mankiewicz sold and delivered the paint products to AAR, in full, and there is no claim (or facts to suggest) that the value of the paint products supplied was inconsistent with the price AAR paid to Mankiewicz. *See* Griggs, 959 So.2d 321-22 (when adequate consideration is given for the benefit conferred, a claim for unjust enrichment fails). Therefore, Mankiewicz is entitled to summary judgment on Count VIII.

## CONCLUSION

For the foregoing reasons, Defendant, Mankiewicz Coatings, LLC, respectfully requests the Court to enter summary judgment in its favor and against HAL on all claims in the Amended Complaint.

## **REQUEST FOR HEARING**

Mankiewicz respectfully requests a hearing on Mankiewicz's Motion for Summary Judgment. Mankiewicz submits it would be of benefit to the Court to hear the parties to address the issues raised, as well as to answer any questions the Court may have after reviewing the record and briefing. It is estimated that 2 hours would be sufficient (1 hour per side).

SGR/13533233.4

**SMITH, GAMBRELL & RUSSELL, LLP**
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Telephone:  (904) 598-6127
Facsimile:  (904) 598-6227

s/ James H. Cummings
Dana G. Bradford II
Florida Bar No.: 167542
dbradford@sgrlaw.com
apelegrin@sgrlaw.com
James W. Middleton
Florida Bar No.: 508152
jmiddleton@sgrlaw.com
tgreene@sgrlaw.com
James H. Cummings
Florida Bar No.: 27657
jcummings@sgrlaw.com
apelegrin@sgrlaw.com
*Attorneys for Defendant Mankiewicz Coatings, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert C. Owens, Esq.
Robert C. Owens, P.A.
18890 SW 264th Street
Miami (Homestead), Florida 33031
bobowens@avlaw.com

*Attorneys for Plaintiff Hawaiian Airlines, Inc.*

Christopher R. Christensen, Esq.
cchristensen@condonlaw.com
Anthony U. Battista, Esq.
abattista@condonlaw.com
Nicole M. Smith, Esq.
nsmith@condonlaw.com
Evan Kwarta, Esq.
ekwarta@condonlaw.com
Condon & Forsyth LLP
7 Times Square
New York, New York 10036
*Attorney for Plaintiff Hawaiian Airlines, Inc.*

s/ James H. Cummings
James H. Cummings

21